**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 0 1 2009 ★

BROOKLYN OFFICE

)
ORLANDO S. RAMIREZ, individually )
and on behalf of all others similarly situated, )
)
    Plaintiff, )
)
   v. )
)
DOLLAR PHONE CORP., d/b/a DPC, )
DOLLAR PHONE SERVICES, INC., )
DOLLAR PHONE ENTERPRISE, INC., and )
DOLLAR PHONE ACCESS, INC., )
)
    Defendants. )
)

**PRELIMINARY AND**
**PROVISIONAL DRAFT**
**MEMORANDUM & ORDER**

**09-CV-2290 (JBW) (MDG)**

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Table of Contents**

I.   Introduction .................................................................................................... 2
II.   Prepaid Calling Card Industry ....................................................................... 4
III.   Present Litigation ............................................................................................ 7
  A.   Facts ........................................................................................................... 8
  B.   Positions of the Parties ........................................................................... 11
   1.   Defendants ......................................................................................... 11
   2.   Plaintiff .............................................................................................. 13
   3.   Federal Government .......................................................................... 14
  C.   Law ........................................................................................................... 14
   1.   *Hamilton v. Beretta* and the Problem of Manufacturers' Liability ... 14
   2.   Class Certification Issues .................................................................. 16
IV.   Related Litigation .......................................................................................... 18
  A.   Private Plaintiffs ...................................................................................... 18
  B.   FTC Action ............................................................................................... 20
  C.   State Attorneys General .......................................................................... 22
V.   Regulation of Prepaid Calling Card Industry ............................................... 24
  A.   Existing State Statutes ............................................................................. 25

1

B.   Proposed Federal Prepaid Calling Card Consumer Protection Act of 2009 .......................28

VI.   Need for Uniform National Regulations ...........................................................................29

VII.   Conclusion ........................................................................................................................32

## I.   Introduction

This Preliminary and Provisional Draft Memorandum and Order is issued to assist the parties in preparing for a summary judgment hearing.  The troubling question is this:  Is it not time to blow the whistle on repetitive and largely ineffective prepaid phone card litigations in favor of reasonable national regulations crafted after Congressional and federal administrative hearings?

Plaintiff Orlando S. Ramirez, on behalf of himself and others, brings this class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  He alleges that defendants Dollar Phone Corp. ("DPC"), Dollar Phone Services, Inc. ("Services"), Dollar Phone Enterprise, Inc. ("Enterprise"), and Dollar Phone Access, Inc. ("Access") (all four collectively, "Dollar" or the "Dollar companies") violated the consumer fraud acts ("CFAs") of eleven states and were unjustly enriched at consumers' expense, through deceptive practices relating to prepaid calling cards.  Dollar has moved to dismiss the complaint.

The court directed the parties to treat Dollar's motion as one for summary judgment, and it requested relevant information from the federal government—a non-party.  Summary judgment of dismissal is arguably appropriate because "a class action is [*not*] superior to other available methods for fairly and efficiently adjudicating [this] controversy" under Rule 23(b)(3) of the Federal Rules of Civil Procedure, and a class action is inappropriate under Rule 23(b)(2). The superior and sensible way to deal with this controversy, involving as it does a multibillion-dollar national and international communication industry that serves large numbers of relatively

2

poor people in every state, may well be for the Federal Trade Commission ("FTC") to issue

appropriate regulations. Were certification denied—as now seems likely—plaintiff's claim

would be for some $2.00, well below the Class Action Fairness Act's $5 million jurisdictional

minimum. 28 U.S.C. § 1332(d)(2). Amendment of the complaint would not be warranted since

the $75,000 claim required for a garden-variety diversity action could not be established, and in

the absence of a class the parties are all citizens of New York. 28 U.S.C. § 1332(a).

Deceptive and abusive practices in the prepaid calling card industry have been widely

documented. *See infra* Part II. Senator Bill Nelson of Florida, in his remarks upon introducing

the proposed Prepaid Calling Card Consumer Protection Act of 2009, observed that

"[u]nfortunately, some providers and distributors of these cards are scamming consumers—by

imposing undisclosed junk fees, charging exorbitant rates, and selling cards that expire shortly

after consumers start using them." 155 Cong. Rec. S2967 (daily ed. Mar. 10, 2009). Recent

law-enforcement investigations have found "unfair and deceptive business practices," including

"charging customers for calls where they receive busy signals, imposing weekly 'maintenance

fees' that may take away up to 20 percent of the card's overall value, and billing for calls in 3-

minute increments." *Id.* Based on empirical research in this area, one expert has concluded that

"[b]ecause accurate and complete information typically isn't available, it is impossible for

consumers to make informed decisions before using the cards. . . . [I]nformation is often

confusing, incomplete, and even deceptive." Calling Card Consumer Protection Act:  Hearing

on H.R. 3402 Before the Subcomm. on Commerce, Trade and Consumer Protection of the H.

Comm. On Energy and Commerce, 110th Cong. 4 (Sept. 16, 2008) (testimony of Dr. Julia

Marlowe, Assoc. Prof. Emeritus, Dep't of Housing and Consumer Economics, Univ. of Georgia)

(hereinafter "Marlow Testimony"), *available at* http://energycommerce.house.gov/images/

3

stories/Documents/Hearings/PDF/Testimony/ CTCP/110-ctcp-hrg.091608.CallingCard.
MarloweTestimony.pdf.

Purchasers are typically low-income consumers who cannot obtain traditional phone
service, many of them recent non-English-speaking immigrants who use the cards to call home.
The industry's problems are of special concern because the cards are widely marketed to this
particularly vulnerable group. *See* Mark E. Budnitz, Martina Rojo & Julia Marlowe, *Deceptive
Claims for Prepaid Telephone Cards and the Need for Regulation*, 19 Loy. Consumer L. Rev. 1,
2, 13 (2006).

The industry's deceptive practices have been the subject of extensive, repetitive private
litigation as well as repeated enforcement actions by the FTC and several state Attorneys
General. *See infra* Part IV.  Conflicting regulation in a number of states would be superceded by
the proposed federal Prepaid Calling Card Consumer Protection Act of 2009. *See infra* Part V.

Despite its mission "to prevent persons, partnerships, or corporations . . . from using . . .
unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(2), the FTC
has failed to comprehensively address the problems raised by the instant litigation.  Plaintiff's
allegations present issues of national scope better addressed and resolved on a uniform basis,
rather than by piecemeal state-law-based litigation.

## II.    Prepaid Calling Card Industry

Prepaid calling cards are sold by convenience stores, gas stations, and other retailers in
denominations as small as two dollars.  The cards represent a credit that may be used to obtain
telephone calling time from any phone.  Most cards display a local or toll-free access number
and a personal identification number ("PIN").  Users call the access number and enter the PIN.
The balance on the card is then applied toward the user's call.  The companies that provide

4

service for the cards use the PIN to keep track of how much value—measured in dollars, minutes, or other units—remains on each card. Once the balance on a card is depleted, the user's call is terminated. *See generally* Fed. Trade Comm'n, FTC Facts for Consumers, "Buying Time: The Facts About Pre-Paid Phone Cards" (Mar. 2008), *available at* http://www.ftc.gov/bcp/edu/ pubs/consumer/products/pro04.shtm; *see also Adighibe v. Clifton Telecard Alliance*, No. 07-CV-1250, 2008 WL 940777, at *1 (D.N.J. Apr. 7, 2008) (describing operation of prepaid calling cards).

These cards take advantage of modern technology, permitting consolidation of communications using many available connecting resources in an efficient way. They offer convenience and relatively low per-minute rates, particularly for international calls. In recent years, the prepaid calling card industry has mushroomed into a huge international industry. *See* Brian Grow, *Talk Isn't So Cheap on a Phone Card*, Bus. Week, July 23, 2007, at 64 (estimating in July 2007 that $4 billion in prepaid calling cards were sold each year).

A complex division of labor structures the industry. Different companies or corporate affiliates each perform distinct roles. *See generally* Consumer & Governmental Affairs Bureau, Fed. Commc'ns Comm'n, *Pre-Paid Phone Cards: What Consumers Should Know* (Nov. 6, 2008), *available at* http://www.fcc.gov/cgb/consumerfacts/prepaidcards.html; *see also* Aug. 31, 2009 Hr'g Tr. at 5-18 (statements of Dollar's counsel). Domestic and foreign telephone companies own the local and international telephone or internet lines and satellite systems that actually carry telephone calls. Minutes of calling time are purchased from these telephone companies by resellers, who shop among hundreds of worldwide companies seeking the best rates for different destinations. The resellers then sell the calling time in bulk to service providers who create and issue the prepaid calling card PINs.

5

It is these service providers, represented by defendant Enterprise, who assign monetary values to the PINs, set the per-minute rates at which calling time is charged to users, provide access via local or toll-free phone numbers printed on the cards, and often supply toll-free customer service to users. The service providers do not, however, typically print and distribute the cards themselves. Rather, they sell their PINs to distributors at a discount from the assigned face value. These distributors—sometimes also called "wholesalers"—print calling cards bearing the service providers' PINs and access numbers. The distributors then market the cards by selling them to convenience stores and other retailers. The retailers finally vend the cards to consumers for the face value assigned to them by the service provider. It is unclear whether it is the legal duty of the service provider (who issues the PINs and provides calling service) or the distributor (who prints the cards and distributes them to retailers) to make disclosures in connection with a particular card. *See infra* Part III.

Law enforcement agencies and researchers investigating the industry have discovered widespread discrepancies between the amount of calling time claimed in advertising and marketing materials, and the calling time actually available to card users. In tests conducted by the FTC in connection with recent enforcement actions, the cards were found to provide half or less than half of the advertised minutes. Press Release, Fed. Trade Comm'n, Prepaid Calling Card Distributor Agrees to Pay $1.3 Million (June 29, 2009) ("In tests conducted by the FTC, the calling cards on average provided less than half of the advertised calling minutes."), *available at* http://www.ftc.gov/opa/2009/06/cta.shtm; Press Release, Fed. Trade Comm'n, Companies Agree to Pay $2.25 Million as Part of FTC Crackdown on Fraud in the Prepaid Calling Card Industry (Feb. 10, 2009) ("The FTC's testing showed that consumers received only about half the advertised minutes."), *available at* http://www.ftc.gov/opa/2009/02/alternatel.shtm. Surveys of a

6

range of prepaid cards by the nonprofit Hispanic Institute yielded similar results. *See* Hispanic

Institute, Calling Card Verification Test Plan (2007), *available at* http://thehispanicinstitute.net/

files/Test%20Plan.pdf.  Another study of calling cards marketed to Spanish-speaking consumers

found that "[m]inutes are often deducted for hidden fees, and consequently, consumers do not

receive the number of minutes they are told are available. . . . The average actual cost of the

cards was 87% higher than the average expected cost." Budnitz, et al., *supra*, at 6-7.

Underlying these findings are often-inadequate disclosures of costs, as well as consumer

confusion and complex fee calculations, which involve minute-rounding, per-call fees, periodic

retention of card fees, and other types of charges and surcharges. *See* Marlow Testimony, *supra*,

at 2.  Compounding these problems are customer service representatives, theoretically available

through toll-free numbers, who often provide incomplete or inaccurate information, or who

cannot be reached. *See id.* at 2-3.

## III.    Present Litigation

Plaintiff alleges that he himself was cheated out of some two dollars on a card he

purchased; that the Dollar companies were greatly unjustly enriched at the expense of many

putative class members; and that defendants violated the CFAs of eleven states through

deceptive practices. Am. Class Action Compl. and Demand for Jury Trial ("Am. Compl.")

¶¶ 45-62.  He seeks monetary damages, a permanent injunction, and a declaratory judgment that

Dollar unlawfully failed to disclose material facts about the fees and conditions applying to their

cards. *Id.* at 17-18 & ¶ 67.  Certification of two classes, denominated "Class A" and "Class B,"

is sought. *Id.* ¶ 38.  Putative "Class A" includes all persons who purchased Dollar prepaid cards

since January 4, 2004; putative "Class B" includes all residents of specified states with

"substantially similar" CFAs who purchased Dollar prepaid cards since January 4, 2004. *Id.*

7

Subject matter jurisdiction is based upon the Class Action Fairness Act, 28 U.S.C. § 1332(d). *Id.* ¶ 13.

Defendants move to dismiss plaintiff's amended complaint on the grounds that: (1) the complaint fails to comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the states' CFAs; (2) plaintiff lacks standing to pursue his CFA claims because he will not be able to obtain class certification; and (3) this court lacks subject matter jurisdiction over a number of the CFA claims. The parties were directed to treat the motion as one for summary judgment and conduct limited discovery.

Oral argument on defendants' motion was heard on August 31, 2009. At the court's request, a representative of the United States Attorney's Office for the Eastern District of New York was present to address the federal government's interest.

A.   *Facts*

Plaintiff purchased a two dollar "Langosta" brand prepaid calling card (the "Langosta card") in June 2007 in Great Neck, N.Y. Decl. of Orlando Ramirez ¶ 2. He used the card to place an international call to El Salvador. At the initiation of the call, a voice prompt announced that plaintiff had 48 minutes of calling time. *Id.* ¶ 5. The call terminated after approximately 25 minutes, apparently because the card's balance was depleted. *Id.*

The Langosta card's packaging materials displayed disclosures in both English and Spanish:

> International calls made to cellular phones and calls via toll-free numbers are billed at higher rates. Maintenance/service fees and other charges may apply. Calls made from US payphone will have a per call fee applied. Application of surcharges and fees may have an effect of reducing total minutes on cards. Prices are subject to change without notice. This card has no cash value. Card expires 3 months after first use or 12 months after activation. Service provided by DPE. . . .

8

> For Customer Service issues or calling rate information, please call 1-800-413-0351.

*Id.*, Ex. A. The parties do not dispute that the service provider "DPE" identified in this disclosure is defendant Enterprise, or that Enterprise provided the phone service for this card. Defendants assert that although the card was serviced by Enterprise, the card itself was distributed by a third-party distributor—unrelated to the Dollar companies—that purchased the PIN number from Enterprise and printed and distributed the Langosta card. Decl. of Abe Greenfield ("Greenfield Decl.") ¶ 7; Reply Decl. of Abe Greenfield ("Greenfield Reply Decl.") ¶¶ 16-22. The card was, it is contended, "neither printed, designed, marketed, nor distributed by Enterprise." Greenfield Reply Decl. ¶ 22.

Enterprise and the other Dollar companies are all headquartered at the same location in Brooklyn, New York. Am. Compl. ¶ 11. The President of Enterprise provided a declaration describing the roles of each of the Dollar companies as follows:

> [The Dollar companies are] involved in the telecommunications industry. Defendant DPC purchases access to long distance telecommunications service from telecommunications carriers ("Carriers") and resells long distance telecommunications services to other Carriers. Defendant Enterprise is itself an independent licensed Carrier, and the largest customer of DPC.
> Enterprise resells its long distance services to a network of independent wholesalers of prepaid calling cards nationwide ("Wholesalers"). Enterprise provides the Wholesalers with telephone access numbers and personal identification numbers ("PINs") that are assigned by the Wholesalers to prepaid calling cards ("Cards") the Wholesaler designs and prints. A caller holding such a Card may access telecommunications time by dialing the appropriate telephone access number and PIN number associated with the Card. . . .
> Relevant here is the fact that neither DPC nor Enterprise sells prepaid calling Cards. DPC sells long distance minutes to other Carriers, and thus has no involvement in the calling card business other than as a supplier of wholesale long distance services to its customer Enterprise. Enterprise, in turn, resells long distance services, packaged in the form of PINs, to independent Wholesalers nationwide. These Wholesalers themselves print Cards bearing Enterprise PINs. *It is the Wholesalers, not Dollar, that design and market the Wholesalers' Cards. The Wholesalers, not Enterprise, disclose rates and charges to consumers.*

9

Dollar does not sell Cards to individual consumers such as the plaintiff in this action, and does not advertise or market Cards to consumers. Dollar does not make any representations about Cards to consumers. The complaint in this action identifies a private label calling Card, owned and designed by an independent Wholesaler. Enterprise does not manufacture or design such Cards that are sold to consumers. Rather, Enterprise sells telecommunications time and services to Wholesalers. It is these Wholesalers who manufacture Cards or arrange for their manufacture. Except for certain exceptional instances not relevant here, it is the Wholesalers who design the Cards, determine the content of disclosures or other copy appearing on Cards and market Cards for sale to consumers. *The Wholesalers, not Enterprise, determine the form of image appearing on Cards and Card marketing materials and advertisements, including any disclosure of applicable rates and surcharges.*

Greenfield Decl. ¶¶ 3-4, 6-7 (emphases added).

Dollar maintains that it was not responsible for printing the Langosta card, or for any disclosures on the card, on its packaging, or in associated advertisements. Plaintiff disputes this on the basis of unsworn discovery responses by a third-party distributor of Dollar cards from an unrelated litigation. *See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl. Summ. J. Br.") at 4-5. This distributor indicated that "Dollar composes the disclaimers to be put on card and advertisements [and] sets the fees and other charges applicable to the cards." *Id.* at 4. Arguing that this suggests that Dollar may have been responsible for the Langosta card's disclosure language, plaintiff requests further discovery on the issue. *Id.* at 5.

According to plaintiff, defendants have "systematically, intentionally, and surreptitiously . . . failed to disclose" information on Dollar phone cards necessary for a reasonable consumer to understand the cards' pricing structure. Am. Compl. ¶ 29. The allegedly undisclosed information includes:

a. The price the consumer pays per billing increment (10¢ per minute);

b. That Defendants impose a "per call" fee on all calls using a Dollar Card and the exact amount of the fee;

     c.  That Defendants impose a higher rate for calls to mobile
        telephones and the amount of that rate; and

     d.  That Defendants impose a "weekly fee" of $ 0.60 and the
        circumstances in which it applies.

*Id.*  Plaintiff contends that Dollar's deceptive practices prevented putative class members from

understanding the true value of Dollar's calling cards and from making informed purchasing

decisions:

> Had Defendants clearly and conspicuously disclosed how much the Card is really
> worth in terms of what the consumer pays per minute of calling time and that the
> stated monetary value of Dollar Phone Cards would be greatly reduced or
> eliminated <u>not</u> by calling time but by Defendants undisclosed fees, surcharges and
> conditions, Plaintiff and Class Members would not have purchased them.
> Defendants have uniformly deprived them from making informed decisions about
> buying Defendants' Cards.

*Id.* ¶ 6.

### B.   *Positions of the Parties*

#### 1.   Defendants

Defendants moved to dismiss plaintiff's complaint on three grounds.  First, that plaintiff's

complaint fails to comply with the pleading requirements of both Rule 9(b) of the Federal Rules

of Civil Procedure and the states' CFAs.  Mem. of Law in Supp. of Defs.' Mot. to Dismiss Am.

Compl. at 16-27.  They argue that plaintiff did not sufficiently allege why any of the Dollar

companies owed him a duty to disclose.  *Id.* at 19-21.  Under the states' CFAs, the claim that

Dollar did not reveal price per minute information is said to fail, because price per minute varies

and could not have been known at the time the Langosta card was sold.  *Id.* at 21-23.  According

to defendants fees were adequately disclosed on the card and its packaging materials, and

allegations that these disclosures were inadequate are excessively vague.  *Id.* at 23-26.  Applying

the same arguments, defendants conclude that plaintiff's claims of unjust enrichment and for declaratory relief are not pled with sufficient particularity. *Id.* at 26-27.

Second, defendants take the position that plaintiff lacks standing with respect to the state CFA claims. They argue that because the states' CFAs are not sufficiently similar to one another, putative "Class B" fails Rule 23's commonality requirement. *Id.* at 27-30.

Third, defendants argue that subject matter jurisdiction over a number of the CFA claims is lacking because certain CFAs authorize actions only in state court, impose procedural requirements before a claim may be brought, and time-bar members of putative "Class B." *Id.* at 30-38.

After limited discovery, defendants offered several additional arguments in support of summary judgment. They argue that plaintiff cannot show that he was injured by defendants' alleged nondisclosures because plaintiff had no belief at the time he purchased the Langosta card about the number of minutes of calling time on the card. Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. at 14-16. Plaintiff's claims against defendants Access, DPC, and Services are also said to fail because no facts are alleged with respect to these defendants other than their affiliation with Enterprise, and because evidence shows that only Enterprise was involved in providing calling service for the Langosta card. *Id.* at 19-20. The unsworn discovery responses of an unrelated distributor, which may suggest that the Dollar companies were responsible for the disclosures that appeared Dollar cards, are contended to be inadmissible and thus insufficient to defeat summary judgment. *Id.* at 20-22. In defendants' view further discovery is unwarranted. *Id.* at 23-25.

12

### 2.    Plaintiff

To defendants' arguments on the motion to dismiss, plaintiff responds, first, that his complaint meets the requirements of Rule 9(b) by adequately alleging that defendants failed to disclose material facts concerning the terms of service of the Langosta card. Defendants' other arguments based on failure to meet pleading standards are contended to be based on factual disputes that have no bearing on the adequacy of plaintiff's pleadings. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Am. Compl. at 7-12.

Second, plaintiff contends that the arguments that "Class B" cannot be certified, that jurisdiction is lacking under some state CFAs, and that some class members' claims are barred by applicable statutes of limitations, are addressed to the issue of certification rather than to the adequacy of plaintiff's pleading, and are thus premature. *Id.* at 13-14, 16.

Third, plaintiff argues that pre-filing requirements imposed by certain state CFAs are procedural requirements that are not applicable in federal court, and that the language in CFAs regarding where private actions may be brought is permissive rather than prohibitive, and does not bar prosecuting claims in federal court. *Id.* at 14-16.

In opposing summary judgment plaintiff points out that he has taken only very limited and incomplete discovery. Conceding that the distributor's unsworn discovery responses are inadmissible, plaintiff argues that "[i]f presented in the form of admissible evidence, these facts could create a genuine issue of material fact," contradicting statements in declarations submitted in support of defendants' summary judgment motion. Pl.'s Summ. J. Br. at 4. Plaintiff requests further discovery. *Id.* at 5.

13

3.    Federal Government

The United States Attorney's Office for the Eastern District of New York was present at the August 31, 2009 hearing through an Assistant United States Attorney. *See* Aug. 31, 2009 Hr'g Tr. at 3. He stated that the FTC has been active in bringing deceptive practices cases against prepaid calling card distributors. *Id.* at 19-20. No information was available at the time of the hearing regarding applicable federal regulations or federal agency policies concerning the prepaid calling card industry. *Id.* at 20-21. The government was requested to submit a report within 45 days of the hearing regarding any applicable federal regulations, federal enforcement activity, and the policies of the FTC, the Federal Communications Commission, and any other concerned federal agency. *Id.* at 35-37 (requesting "a comprehensive discussion of what they have done and what they plan to do about this and what they—by 'they,' I mean the Federal Government, Department of Justice and the administrative agencies—suggest that this Court do about it.").

C.    *Law*

For the reasons stated below, the court finds it undesirable to rule on defendants' motion before further argument. It is, nevertheless, at the moment disinclined to allow plaintiff's class action to go forward. The following tentative observations on the motion for summary judgment are offered for the parties' consideration, subject to revision in light of further briefing and argument.

1.    *Hamilton v. Beretta* and the Problem of Manufacturers' Liability

Dollar has raised at least one potential legal ground for summary judgment that is worthy of further consideration, namely that the Dollar companies are not the proper defendants in this action because third-party distributors are responsible for marketing statements and disclosures

14

in connection with the calling cards serviced by Dollar.  The Court of Appeals for the Second

Circuit and the New York Court of Appeals have held that under similar circumstances

manufacturers are not responsible for monitoring the activities of the distributors who sell their

products. *See Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21, 28-30 (2d Cir. 2001) (refusing to

hold gun manufacturers responsible for the acts of gun dealers and distributors, based on the

New York Court of Appeal's answer to a certified question in *Hamilton v. Beretta U.S.A. Corp.*,

750 N.E.2d 1055 (N.Y. 2001)).  Were *Hamilton* to control, it is doubtful whether the Dollar

companies would be liable for inadequate disclosures if third-party distributors, rather than

Dollar, determined the material printed on the cards.

In this connection it is notable, though not dispositive, that the FTC has directed its

enforcement actions in this area against calling card distributors, rather than against service

providers like Dollar. *See* Compl. for Permanent Inj. and Other Equitable Relief ¶¶ 9-10, *FTC v.*

*Clifton Telecard Alliance One LLC, et al.*, No. 08-CV-1480 (D.N.J. Mar. 25, 2008) ("Defendants

do not provide the telecommunications service for their prepaid calling cards.  Defendants use

telecommunications providers . . . ."); Compl. for Permanent Inj. and Other Equitable Relief ¶

20, *FTC v. Alternatel, Inc., et al.*, No. 08-CV-21433 (S.D. Fla. May 19, 2008) ("Defendants do

not provide the telecommunications service for their prepaid calling cards.  Instead, Defendants

purchase the telecommunications service . . . from telecommunications service providers,

including, but not limited to, Dollar Phone, [et al.] . . . ."); Compl. for Permanent Inj. and Other

Equitable Relief ¶ 15, *FTC v. Diamond Phone Card, Inc., et al.*, 09-CV-3257 (E.D.N.Y. July 29,

2009) ("Defendants did not provide the telecommunications service for their prepaid calling

cards.  Instead, it was provided by third-party telecommunications service providers."); *see also*

*infra* Part IV.B.

2.    Class Certification Issues

The issue of standing is a constitutional one and should not be conflated with Rule 23

class action requirements:

> Whether or not the named plaintiff who meets individual standing requirements
> may assert the rights of absent class members is neither a standing issue nor an
> Article III case or controversy issue but depends rather on meeting the
> prerequisites of Rule 23 governing class actions.  The fact that the plaintiff now
> seeks to represent the rights of absent parties because the case or controversy is
> common to those parties does not in any way create additional constitutional
> standing requirements.

William B. Rubenstein et al., 1 Newberg on Class Actions § 2:7 (4th ed. 2008).

Plaintiff alleges that he was injured by defendants' inadequate disclosures.  His

individual standing to bring his own individual claims has been established.  *See Ramirez v. STI

Prepaid LLC*, No. 08-CV-1089, 2009 WL 737008, at *7 (D.N.J. Mar. 18, 2009) ("[T]he fact that

the named Plaintiffs may not have individual standing to allege violations of consumer

protection laws in states other than those in which they purchased Defendants' calling cards is

immaterial" on a motion to dismiss a class action.).

Notwithstanding plaintiff's standing to bring his individual claim, in light of the context

of the case and his own insignificant alleged injury and lack of resources, it would appear that he

cannot satisfy the requirements that the class "representative . . . fairly and adequately protect the

interests of the class," Rule 23(a)(4), and that "a class action [be] superior to other available

methods for fairly and efficiently adjudicating the controversy," Rule 23(b)(3).  Plaintiff's

counsel is presumably competent to press the case and has the necessary resources—realistically

the most important factor for purposes of Rule 23(a)(4) in cases involving very small claims.

Rule 23(b)(3) permits class certification only where *a class action is "superior to other*

*available methods for fairly and efficiently adjudicating the controversy."*  (Emphasis added.)  In

16

the present case, the amount that would be recovered by any class member is small, to the point that it would probably not even warrant submitting a claims form were the class certified and successful in obtaining a recovery. Moreover, many members of the class are undoubtedly illegal immigrants who would be afraid to participate in a legal proceeding that might reveal their presence. The only real immediate monetary beneficiaries of handling the claims of class members through a class action would be the attorneys who hope to collect fees. That does not seem a sufficient basis for certification.

A more appropriate way to protect the rights of the Rule 23(b)(3) class is through regulation and enforcement activity by a federal administrative agency. The only effective remedy for the harms alleged would be a uniform system of regulation of the prepaid calling card industry based on legislation or public administrative rulemaking, including public hearings, resulting in rules that would cover the entire country and take account of international implications. The court system cannot efficiently carry the burden of protecting this class. To use the truncated powers of a misshapen 23(b)(3) class action to address the issues raised in plaintiff's complaint would be unfaithful to the premise and reason for the class action—considerations of equity and good judgment.

Whether the court possesses discretion under Rule 23(b)(2) to exercise its judgment as to the superiority of a class action is not clear. Rule 23(b)(2) requires "that final injunctive relief . . . is *appropriate respecting the class as a whole*." (Emphasis added.)  It is industry-wide federal regulation, rather than any injunctive relief the court could provide in this limited civil action concerning only some of the many conflicting state laws, which is required effectively to address the conduct alleged in plaintiff's complaint. Reformation of the practices of the industry

17

might justify a class action under Rule 23(b)(2), but this result is best achieved by FTC regulation rather than through repetitive, overlapping civil actions.

Under the special circumstances of the multifarious laws applicable, the court is inclined to conclude that certification is not appropriate under either Rule 23(b)(2) or (b)(3). The fact that plaintiff relies on the Class Action Fairness Act, 28 U.S.C. § 1332(d), does not affect the applicability of Rules 23(b)(2) and (b)(3), since the statute affects the jurisdiction—the *power*— of the court to adjudicate, while the rule tells the court *how* to decide.

## IV.     Related Litigation

Deceptive practices in the prepaid calling card industry have been the subject of private litigation, enforcement actions by the FTC, and administrative actions by at least two state Attorneys General. Several of these proceedings are ongoing. In other cases, proposed or approved settlement agreements or stipulated final orders have been agreed upon by the parties. These agreements and orders differ in how they redress past injuries and seek to reform future conduct.

### A.     Private Plaintiffs

The present litigation is one of at least twenty two private actions filed in federal courts since 2003 involving prepaid calling cards. *See* attached Appendix 1, List of Other Phone Card Cases, Aug. 31, 2009. These cases have been before some fifteen different judges in six different district courts. *Id.* A number have been dismissed without prejudice, many have settled, and some are still pending. *Id.* The Dollar companies are defendants in three such actions. *Id.* Plaintiff Ramirez is a plaintiff in eight such actions, represented in each by the same counsel as in the present action. *See id.*; *see also Ramirez v. Lycatel, LLC*, 07-CV-5533 (D.N.J.); *Ramirez v. Friendly Telecom, Inc.*, 07-CV-5589 (D.N.J.); *Ramirez v. Roslyn Telco Group, Inc.*,

18

07-CV-5590 (D.N.J.); *Ramirez v. SDI Card.com, Inc.*, 07-CV-5591 (D.N.J.); *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, 08-CV-1057 (D.N.J.); *Torres-Hernandez v. STI Phone Card, Inc.*, 08-CV-1089 (D.N.J.); *Ramirez v. Epana Networks, Inc.*, 08-CV-4040 (D.N.J.); *Ramirez v. iBasis, Inc.*, 08-CV-5125 (E.D.N.Y.).

Proposed or approved settlement agreements in three cases for which such documents are publicly available indicate that the terms on which these cases have settled or are likely to settle vary significantly. In *In re IDT Corp. Calling Card Terms Litig.*, No. 03-CV-375 (D.N.J.), the court approved a settlement agreement under which the defendants agreed to provide $2 million in donations to charities, and to create two pools of funds totaling $20 million for refunds to class members who purchased calling cards, to be distributed in $0.50 increments according to detailed procedures. *See* Class Settlement Agreement and Release, Aug. 7, 2006, §§ 6(d) & (e), Ex. 1 to Certification of Pamela E. Kulsrud in Supp. of Mot. for Preliminary Approval of Class Settlement, *In re IDT Corp. Calling Card Terms Litig.*, No. 03-CV-375 (D.N.J. Aug. 18, 2006). The *IDT* settlement contains extensive provisions governing the defendants' future conduct. It requires specific disclosures regarding "non-usage fees" and higher rates for calls made via toll-free access numbers, *id.* § 6(b)(1)-(2); requires customer service and rate-inquiry numbers to be included on calling cards, packaging, and posters, *id.* § 6(b)(3); and requires the defendants to "submit for consideration to the New Jersey Attorney General's Office proposed uniform calling card disclosure regulations and . . . [to] cooperate with the [New Jersey] Attorney General's Office," *id.* § 6(c).

In *Monday v. Locus Telecomms., Inc.*, No. 07-CV-2659 (D.N.J.), the court approved a settlement agreement under which the defendant agreed to create a $300,000 fund for donations to charities, to provide $200,000 in product discounts to class members, and to provide refunds

19

of up to approximately $3.7 million for class members who bought calling cards, to be

distributed according to procedures similar to those in the *IDT* settlement. The *Monday*

settlement contains no provisions governing the defendant's future conduct. *See* Class

Settlement Agreement and Release, July 30, 2008, § 6, Ex. B to Certification of Peter J.

Gallagher in Supp. of Def.'s Mot. for Final Approval of Settlement and Certification of Class,

*Monday v. Locus Telecomms., Inc.*, No. 07-CV-2659 (D.N.J. Mar. 6, 2009).

A proposed settlement agreement in *Coppolino v. Total Call Int'l, Inc.*, No. 08-CV-539

(D.N.J.) would provide refunds of up to $1.9 million for class members who bought calling

cards, to be distributed according to procedures similar to those in the *IDT* settlement.

[Proposed] Class Settlement Agreement and Release § 6, Ex. 1 to Certification of James E

Cecchi, *Coppolino v. Total Call Int'l, Inc.*, No. 08-CV-539 (D.N.J. June 26, 2009).  The

proposed *Coppolino* agreement would include the following provision governing the defendant's

future conduct:

> [Defendant] shall, on a forward going basis, comply with the following in
> connection with its sale, distribution, and manufacturing of prepaid calling cards:
> (1) when advertising rates, any limitations for said rates must be included on the
> advertisement; (2) all fees for use of the prepaid calling card must be printed on
> the card; and (3) when making statements regarding amount of minutes remaining
> for a call, doing so accurately and inclusive of all fees being incurred on the call.

*Id.* § 7.

B.      *FTC Action*

The FTC has brought at least three recent enforcement actions against prepaid calling

card distributors on the basis of alleged deceptive practices. *See* Appendix 1. It describes these

actions as "part of an ongoing FTC crackdown on fraud in the prepaid calling card industry," in

which it has "established a joint federal-state task force concerning deceptive marketing practices

. . . , and continues to investigate other prepaid calling card operations." Press Release, Fed.

Trade Comm'n, Prepaid Calling Card Distributor Agrees to Pay $1.3 Million (June 29, 2009),

*available at* http://www.ftc.gov/opa/2009/06/cta.shtm. *See also, e.g., Fed. Trade Comm'n, et al.*

*v. Trans-Asian Commc'ns, Inc.*, No. 97-CV-5764 (S.D.N.Y. Mar. 26, 1998).

One FTC action is pending in this court. *Fed. Trade Comm'n v. Diamond Phone Card,*

*Inc.*, 09-CV-3257 (E.D.N.Y.) (filed July 29, 2009). Two other cases have settled in the past

year, resulting in stipulations that provide for monetary penalties, permanent injunctions, and

detailed compliance, monitoring, and recordkeeping obligations. *See* Stipulated Final Order for

Permanent Inj. and Monetary J. as to All Defs., *Fed. Trade Comm'n v. Alternatel, et al.*, No. 08-

CV-21433 (S.D. Fla. Feb. 10, 2009) (hereinafter the "*Alternatel* Order"); Stipulated Final Order

for Permanent Inj. and Monetary J. as to Defs. Clifton Telecard Alliance One LLC and Mustafa

Qattous, *Fed. Trade Comm'n v. Clifton Telecard Alliance One LLC, et al.*, No. 08-CV-1480

(D.N.J. June 18, 2009) (hereinafter the "*Clifton* Order").

The *Alternatel* and *Clifton* Orders (together, the "FTC Orders") are substantially

identical. In each order, a monetary judgment for equitable relief is entered jointly and severally

against the defendant distributors. *Alternatel* Order § III; *Clifton* Order § III. The defendants are

enjoined from falsely representing the number of calling minutes on prepaid calling cards, and

are required to make "clear and prominent" disclosures of all material limitations, including card

expiration dates, the existence and amounts of fees, and limitations on the periods during which

calling minutes or per-minute rates are available. *Alternatel* Order § II; *Clifton* Order § II.

Under the FTC orders, the defendant distributors assume extensive and detailed

responsibilities to monitor for a period of five years the accuracy and appropriateness of their

calling cards disclosures. *Alternatel* Order § V; *Clifton* Order § VI. Procedures must be

21

implemented and maintained to ensure distribution of appropriate point-of-sale materials, and to confirm that only appropriate materials are displayed by retailers. *Alternatel* Order § V.A-G; *Clifton* Order § VI.A-E. Defendants are also obligated to routinely monitor the rates, limitations, fees, and charges imposed by the service providers who service their cards, and to ensure that point-of-sale disclosures remain consistent with service providers' policies. *Alternatel* Order § V H-I; *Clifton* Order § VI.C, F-G. Tests of random samples of prepaid calling cards must be conducted by defendants to confirm the rates and fees applied. *Alternatel* Order § V.H.2; *Clifton* Order § VI.F.2.

FTC Orders require the defendant distributors to maintain for a period of seven or eight years records, including all complaints and refund requests, all marketing and advertising materials, and all documents such as call logs that reflect advertised number of call minutes or per-minute rates and the actual number of talk minutes delivered. *Alternatel* Order § VIII (eight years); *Clifton* Order § VIII (seven years). For a period of four or five years, the defendant distributors are to report specified events to the FTC and to submit compliance reports at determined intervals. *Alternatel* Order § VII (five years); *Clifton* Order § VII (four years). The FTC is provided with power to monitor the defendants' compliance with their obligations. *Alternatel* Order § VI; *Clifton* Order § V. Other provisions address website representations, toll-free customer service, and complaint handling, *Alternatel* Order § V.J-M; *Clifton* Order § VI.H-K.

### C.    State Attorneys General

Attorneys General, including those of Florida, New Jersey, New York, and Texas, have been active in combating deceptive practices in the prepaid calling card industry. *See, e.g.*, State Telecom Activities, Commc'ns Daily, June 2, 2008, *available at* 2008 WLNR 10563594

22

(describing Texas Attorney General's suit alleging prepaid calling card company "consistently delivered only 40 percent of the minutes it promised to customers on its cards and in its ads"); Press Release, New York State Attorney General's Office, Pre-Paid Phone Card Sweep Cleans up Deceptive Posters (Apr. 12, 2001), *available at* http://www.oag.state.ny.us/media_center/ 2001/apr/apr12c_01.html (announcing settlements with five companies accused of "luring people to buy [prepaid calling] cards by promising extremely low per-minute rates without properly disclosing actual costs").

Most active in recent years have been the Attorneys General of Florida and New Jersey. Between June and December 2008, the Florida Attorney General reached settlements with thirteen different prepaid calling card companies, and in March 2009 the New Jersey Attorney General reached settlements with seven companies. The parties were directed by this court to submit copies of the Florida and New Jersey consent decrees, which it has not yet received. The discussion below is based on the Attorneys General's press releases. In both states, the consent decrees apparently required the settling companies to reform their business practices, including their disclosures of fees, charges, and other material terms. The New Jersey and Florida settlements impose similar but not identical obligations.

The New Jersey settlements include requirements that that all advertised minutes or rates be available to the consumer; that all minutes announced in voice prompts provided when a call is placed be actually available for the call; that all fees and surcharges be disclosed on the calling card or its packaging, as well in any advertisements; and that policies for rounding time off for billing purposes be clearly disclosed. *See* Press Release, New Jersey Dep't of Law & Safety, Div. of Consumer Affairs, New Jersey Reaches Settlements With Seven Companies Regarding Pre-Paid Calling Cards (Mar. 17, 2009), *available at* http://www.njconsumeraffairs.com/

press/prepaid.htm. Other terms require that toll-free customer service be available at a clearly disclosed number, and that specified documents and records be available for inspection for three years. *Id.* The settlement terms "mirror requirements contained in a new state law governing pre-paid calling cards that took effect last year." *Id.*; *see* N.J. Stat. Ann. §§ 56:8-175 to 284.

Florida's settlements require that "hidden fees or misleading minute calculations" not be applied; that there be a "clear representation of the exact number of minutes available" to the consumer; that there be "no surcharges resembling taxes"; and that calls only be rounded up to the nearest minute (rather than to longer intervals). *See, e.g.,* Press Release, Florida Attorney General Bill McCollum, McCollum Announces Prepaid Calling Card Settlements, Industry-Wide Reform (June 11, 2008), *available at* http://myfloridalegal.com/newsrel.nsf/newsreleases/79C6666DB24608D785257465004EC901. The Attorney General's Office has stated that it "will continue to work with these companies in a continuing effort to monitor misleading advertising within the prepaid long distance phone card industry and some investigations are still ongoing." *Id.*

Defendant Enterprise is among the companies that have settled with both the Florida and the New Jersey Attorneys General.

## V. Regulation of Prepaid Calling Card Industry

The regulatory regime governing the prepaid calling card industry is incomplete and inconsistent. "[N]either the Federal Communications Commission nor the Federal Trade Commission has taken any action to impose upfront nationwide consumer protection requirements on this industry." 155 Cong. Rec. S2967 (daily ed. Mar. 10, 2009) (Statement of Sen. Bill Nelson). A number of states have laws specifically addressed to the industry, but the large majority rely only on their general consumer protection laws. Those states that have

24

industry-specific laws impose differing requirements and rules. The federal Prepaid Calling Card Consumer Protection Act proposed this year would impose a much-needed uniform national system of regulation.

A.    *Existing State Statutes*

"In most states, there is little or no regulation of prepaid telephone cards. Thus most states do not require phone card companies to disclose essential information and substantive rights that ensure consumers receive satisfactory service." Budnitz, et al., *supra*, at 2. Only a minority of the states have laws specifically addressed to the prepaid calling card industry. *See* Brian Grow, *Talk Isn't So Cheap on a Phone Card*, Bus. Week, July 23, 2007, at 64 (reporting that as of July 2007, "[o]nly 11 states, including California, Connecticut, Florida, and Illinois, have laws on calling cards."); s*ee also, e.g.*, Al. Pub. Serv. Comm'n Rule T-18.1; Alaska Admin. Code tit. 3, § 52.377; Cal. Bus. & Prof. Code § 17538.9; Conn. Gen. Stat. Ann. § 42-370; Fla. Admin. Code Ann. r. 25-24.900 to 935; 815 Ill. Comp. Stat. § 505/2TT; Mo. Code Regs. Ann. tit. 4, § 240-32.130 to 170; N.J. Stat. Ann. §§ 56:8-175 to 284; N.Y. Pub. Serv. Law § 92-f; 16 Tex. Admin. Code § 26.34; Wash. Admin. Code § 480-120-264. In states that have no industry-specific laws, general consumer protection laws provide the only applicable regulations. *See* Brian Grow, *supra* ("Other states rely on generic consumer protection regulations, but those are rarely applied to cards."); *see also* Budnitz, et al., *supra*, at 11-12.

"There is no uniformity in the state law regulating phone cards. States have taken a wide variety of approaches. Some have imposed minimal regulation, while others subject the industry to many specific requirements." Budnitz, et al., *supra,* at 17. To take two examples at opposite ends of the spectrum, the Alabama rules governing prepaid cards are simple and concise, and mostly concern information which must be displayed on the card or its packaging. *See* Al. Pub.

25

Serv. Comm'n Rule. T-18.1.  In contrast, the California statute is long and detailed, and covers a variety of topics such as the information that must be disclosed in advertisements, the use of languages other than English, and required voice prompts prior to calls. *See* Cal. Bus. & Prof. Code § 17538.9.

The problem posed in controlling abuses is thus not only that there are different levels of specificity, but that one state often regulates conduct that another state does not.  California and New Jersey regulate the content of advertisements for prepaid calling cards. *See* Cal. Bus. & Prof. Code § 17538.9(b)(1); N.J. Stat. Ann. § 56:8-176.  Other states do not regulate advertising. *See, e.g.*, N.Y. Pub. Serv. Law § 92-f; 16 Tex. Admin. Code § 26.34.  California and Texas require verbal prompts at the beginning of each call, stating the number of minutes available for that call.  Cal. Bus. & Prof. Code §§ 17538.9(b)(8); 16 Tex. Admin. Code § 26.34(g)(1).  Texas, but not California, requires an additional voice prompt at least one minute before the balance on the card is depleted.  16 Tex. Admin. Code § 26.34(g)(1).  Other states do not have voice prompt requirements. *See, e.g.*, N.Y. Pub. Serv. Law § 92-f; Wash. Admin. Code § 480-120-264. California and Texas, but not other states, require that if a card is marketed in a language other than English, disclosures also be made in that language. *Compare* Cal. Bus. & Prof. Code §§ 17538.9(b)(6) and 16 Tex. Admin. Code § 26.34(f)(1), *with, e.g.*, N.Y. Pub. Serv. Law § 92-f; Wash. Admin. Code § 480-120-264.

Even where states regulate the same conduct, their specific rules may differ in details. The various states' disclosure rules illustrate these disparities.  "There is no national uniform format for disclosures on phone cards, unlike disclosure for credit and debit card transactions." Budnitz, et al., *supra*, at 22.  In California the disclosure requirements are highly detailed:

> In California, the required disclosures on the card or packaging include the "value of the card" as well as any surcharges, taxes or fees. The California statute provides a list of fees, illustrating the complexity of the product's pricing, and how sellers use a variety of different terms, all of which amount to additional cost to the consumer. Further, there are different requirements for disclosing surcharges for international calls. The seller also must disclose the minimum charge per call, the billing decrement, the recharge policy, if any, and the refund policy, if any.
>
>    . . . The statute requires the value of the card and the amount of the charges to be disclosed on the card or its packaging all in the same format. Moreover, if the value of the card is expressed in minutes, those minutes must be designated as either domestic or international. Finally, that designation must be printed on the same line as the value of the card in minutes or on the line immediately following.

Budnitz, et al., *supra*, at 22-23 (footnotes omitted; describing what are now Cal. Bus. & Prof. Code §§ 17538.9(a)(1), (b)(3) & (b)(16)). Alabama's more general rules require only disclosure of the value of the card, the name of the service provider, the expiration date, a customer service number, and applicable rates and fees. Al. Pub. Serv. Comm'n Rule. T-18.1. Connecticut's statute requires disclosure of all surcharges and fees, formulas for rounding of calling time, restrictions on the use of the card, and a toll free customer service number. Conn. Gen. Stat. Ann. § 42-370(b). Each state has its own different set of disclosure requirements.

A pattern of broad similarities combined with minor discrepancies is repeated in other areas. States apply different rules regarding when cards that display no expiration date are deemed to expire; whether live customer service representatives must be available, and at what hours; what information customer service representatives must be able to provide; how rounding of calling-time increments may be done; what standards govern consumers' refund requests; and so on. *See* Budnitz, et al., *supra*, at 24-28.

Uniform compliance is difficult for companies operating in more than one state. The result is a confusing patchwork of state-law rules. *See generally id.* at 18-28.

27

*B.*     *Proposed Federal Prepaid Calling Card Consumer Protection Act of 2009*

Currently before the United States Senate's Committee on Commerce, Science, and Transportation is the Prepaid Calling Card Consumer Protection Act of 2009 (the "Proposed Act"). S. 562, 111th Cong. (2009). The Proposed Act would require the FTC to establish and enforce a uniform nationwide system of regulation of the prepaid calling card industry. It would directly address the deceptive practices at issue in this litigation.

Under the Proposed Act the FTC would prescribe regulations requiring service providers or distributors to disclose specified information at the point of sale, including the value of the card, the amount and application of all fees, refund and expiration rules, limitations on use of the card, the name of the service provider, a toll-free customer service number, and other material terms and information. *See id.* § 3(a). These disclosures would be printed "in a clear and conspicuous location on the card, or on the packaging of the card, so as to be plainly visible to a consumer," either in English or in any other language predominately used. *Id.* §§ 3(b)(1), (4). Similar disclosures would be required in advertisements and promotional materials. *Id.* § 3(b)(3). The Proposed Act specifically provides that generalized disclosures regarding unspecified fees are inadequate: service providers and distributors "may not avoid liability under this section by stating that the displayed, announced, promoted, or advertised minutes, or the per-minute rate to a specific destination, are subject to fees or charges." *Id.* § 4(c).

It would be prohibited for a service provider or distributor to deduct from a card's balance any fee in a way not properly disclosed, *id.* §§ 4(a)(1) & b(1); to provide fewer minutes of calling time than the number advertised or to charge a per-minute rate higher than advertised, *id.* §§ 4(a)(2) & b(2); or to provide fewer minutes of calling time than the number announced in a voice prompt at the time a call is placed, *id.* §§ 4(a)(3) & (b)(3). Service providers would be

28

prohibited from deducting charges for busy or unanswered calls, and from deducting per-minute charges based on increments greater than one minute. *Id.* §§ 4(a)(5) & (6). Violations would be punishable under the Federal Trade Commission Act. *Id.* § 5.

A uniform national system of regulation would be ensured by the Proposed Act's preemption, with certain exceptions, of any inconsistent state laws, *id.* § 8, and by the FTC's residual authority to "prescribe such other disclosure regulations as the Commission determines are necessary to implement this section." *Id.* § 3(c).

## VI.    Need for Uniform National Regulations

The sale of the Langosta card to plaintiff was governed by New York's prepaid calling card statute. *See* N.Y. Pub. Serv. Law § 92-f. Defendant Enterprise, which provided service for the card, is subject to consent orders with the Attorneys General of both New Jersey and Florida. To the extent the Dollar companies service prepaid cards sold in New Jersey, Connecticut, or other states with prepaid calling card laws, they may be subject to conflicting statutory and regulatory requirements of those states. They may also be subject to inconsistent enforcement action by the FTC on the basis of the Federal Trade Commission Act. The Dollar companies are involved in three other private litigations in the federal courts concerning the cards they service. Meanwhile, plaintiff's counsel is a repeat player, having filed nine similar actions with the same plaintiff against prepaid calling card companies in the federal courts.

This sprawling, hit-or-miss, repetitive, costly, and confusing series of civil litigations across many states is an absurd way to control a vital national and international form of communication. It is intolerable for a multi-billion dollar industry affecting the lives of millions of consumers, many of them low-income or recent immigrants to whom telephone contact with loved ones abroad is vital to their own and their families' health and happiness. Empirical

studies of the industry "indicate that consumers have difficulty obtaining necessary information about prepaid telephone cards before purchase. Information is often unavailable, misleading, and confusing." Budnitz, et al., *supra*, at 42. The present chaotic situation is also harmful to the service providers and distributors, who face widely varies state regulatory regimes, in the absence of clearly announced federal regulations. *Id.*

The issues plaintiff has raised are "national problems that are best dealt with on a uniform nationwide basis both to ensure that consumers can enjoy a basic level of protection wherever they live and to lower compliance costs for the industry." *Id.* at 41. Beyond the injuries that are suffered due to deceptive and abusive industry practices, the lack of a uniform regulatory regime itself disadvantages consumers. "Because of the great variation in the kinds of fees assessed, the difficulty in determining how the fees are assessed, and the lack of standardized wording, meaningful comparison shopping is impossible. Uniformity of information, disclosure and standardized names for fees would help consumers, much the same way that nutritional labeling has provided a mechanism for uniform comparison." *Id.* at 9.

State law variances may be particularly important to the many users who are transient harvesters moving from state to state as crops ripen or as other jobs are available. Involved may be complex choice of law issues. For example, if state A, in which the card is bought, requires no announcement of minutes available when a call is placed, but the card is used in state B, which does require such an announcement, which law should apply?

For the reasons summarized by Professors Budnitz, Rojo, and Marlowe in their study of the industry, the most appropriate solution is a uniform federal system for regulation and enforcement:

30

> [F]ederal legislation has several advantages over state regulation. The most obvious benefit is complete national coverage. Another benefit is uniformity. Complete and uniform national coverage helps both the industry and consumers. Many phone card companies sell cards in many states. Having one set of rules greatly lessens their regulatory burden. Furthermore, many companies sell cards on the Internet. A uniform set of rules greatly eases their regulatory burden since they are selling to consumers nationwide. The phone card industry may mount less opposition to a federal law than to state laws because of the advantages of having to comply with only one law. They may actually support a federal law in the belief it would discourage the majority of states that have not yet regulated phone cards from enacting their own laws.
>
> In addition, uniform disclosures, standardized terms, and the same rights help produce educated consumers. This is especially important given the high mobility rates of people who live in the United States. Most will live in several states during their lifetimes. With a federal law, they do not have to learn a new set of rules and definitions every time they move to a new state.
>
> A federal rule may also lead to more effective enforcement than state law. An individual state may have great difficulty enforcing its laws against companies operating from different states, especially those selling on the Internet. Jurisdictional issues may frustrate enforcement. Enforcement by a federal agency would obviate many of these difficulties.

*Id.* at 14-15 (footnotes omitted). The authors recommend a federal statute and regulation through the FTC. *See id.* 15-16. This is consistent with the FTC's view of its own "mission as aggressively monitoring and seeking compensation on behalf of consumers [through] modern 'enforcement efforts aim[ed] to identify violators quickly in order to limit consumer harm, to obtain compensation for injured customers, and to modify orders when necessary to provide additional protection for consumers.'" Adam S. Zimmerman, *Distributing Justice* 25 (July 1, 2009) (unpublished draft) (quoting Fed. Trade Comm'n, *The FTC in 2009: The Federal Trade Commission Annual Report* 54 (March 2009), *available at* http://www.ftc.gov/os/2009/03/2009ftcrptsv.pdf).

The present action is one of a number of similar civil and administrative proceedings concerning alleged deceptive practices in the prepaid calling card industry. *See supra* Part IV. While the federal administrative system dithers, the courts and states struggle—unsuccessfully—

31

to meet a serious set of national and international communication problems that require a uniform national approach.  Piecemeal civil litigation cannot alone address these issues.  *See generally* Essay, *Compensation for Mass Private Delicts: Evolving Roles of Administrative, Criminal, and Tort Law*, 2001 U. Ill. L. Rev. 947, 960-82 (2001) (discussing appropriate roles of administrative and tort systems in protecting citizens and consumers from mass harms).

Allowing the present litigation to proceed would likely compound the problem and encourage perpetuation of an ineffective regulatory regime that is confusing and incomplete, that is unduly burdensome for the industry, and that provides neither effective protection nor a suitable remedy for most injured consumers.  It is desirable, if possible, to identify means by which a uniform, national resolution of these issues may be advanced.  The court expects to rule finally on the issues raised on Dollar's motion for summary judgment after hearing from appropriate agencies of the federal government, including the Department of Justice, the Federal Communications Commission, the FTC, and interested parties.

## VII.   Conclusion

The government shall make its submission by October 16, 2009.  The motion for summary judgment will be heard on November 5, 2009 at 11:00 am, at which time the government, the parties, and any other interested person who wishes to be heard may appear orally or by written submission.  Participation by telephone may be arranged by calling Case Coordinator June Lowe at (718) 613-2525.

32

SO ORDERED.

JACK B. WEINSTEIN
Senior United States District Judge

Dated: October 1, 2009
       Brooklyn, New York