**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 1 0 2009 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

ORLANDO S. RAMIREZ, individually
and on behalf of all others similarly situated,

               Plaintiff,

               v.

DOLLAR PHONE CORP., d/b/a DPC,
DOLLAR PHONE SERVICES, INC.,
DOLLAR PHONE ENTERPRISE, INC., and
DOLLAR PHONE ACCESS, INC.,

               Defendants.

**MEMORANDUM, ORDER
AND JUDGMENT DENYING
CLASS CERTIFICATION AND
GRANTING SUMMARY
JUDGMENT**

**09-CV-2290**

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I.    Introduction ......................................................................................................... 2

II.   Prepaid Calling Card Industry ............................................................................ 5

III.  Present Litigation ............................................................................................... 8

  A.  Facts ................................................................................................................. 9

  B.  Procedural Positions ...................................................................................... 12

    1.  Defendants ................................................................................................ 12

    2.  Plaintiff .................................................................................................... 13

    3.  Federal Government .................................................................................. 14

IV.  Related Litigation .............................................................................................. 16

  A.  Private Plaintiffs ............................................................................................ 16

  B.  FTC Action ..................................................................................................... 18

  C.  State Attorneys General ................................................................................. 20

V.   Regulation of Prepaid Calling Card Industry .................................................... 22

  A.  Federal Regulation ........................................................................................ 22

  B.  Existing State Statutes ................................................................................... 23

  C.  Proposed Federal Prepaid Calling Card Consumer Protection Act of 2009 ...... 26

VI.  Need for Uniform National Regulations ........................................................... 28

VII.   Denial of Class Certification................................................................32

VIII.  Lack of Jurisdiction....................................................................34

IX.    Conclusion .............................................................................35

Appendix 1 – Other Phone Card Cases

Appendix 2 – United States Department of Justice, Report of Administrative Actions to Control
            Phone Cards, Oct. 20, 2009

## I.   Introduction

Plaintiff Orlando S. Ramirez, on behalf of himself and others, brings this class action

pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  He alleges that

defendants Dollar Phone Corp. ("DPC"), Dollar Phone Services, Inc. ("Services"), Dollar Phone

Enterprise, Inc. ("Enterprise"), and Dollar Phone Access, Inc. ("Access") (all four collectively,

"Dollar" or the "Dollar companies") violated the consumer fraud acts ("CFAs") of eleven states

and were unjustly enriched at consumers' expense, through deceptive practices relating to

prepaid calling cards.

Dollar moved to dismiss the complaint.  The court directed the parties to treat Dollar's

motion as one for summary judgment.  It requested, and received, relevant information from the

federal government, a non-party.  *See* Appendix 2, United States Department of Justice, Report

of Administrative Actions to Control Phone Cards, Oct. 20, 2009 ("DOJ Report").

Denial of class certification and summary judgment of dismissal are appropriate.  "[A]

class action is [*not*] superior to other available methods for fairly and efficiently adjudicating

[this] controversy" under Rule 23(b)(3) of the Federal Rules of Civil Procedure.  "[R]elief is

[*not*] appropriate respecting the class as a whole" under Rule 23(b)(2).

In general it is inappropriate to deny those wronged civilly a fallback court-supervised

remedy when the administrative law segment of our justice system has neglected to provide an

available superior form of protection.  There are, however, instances where the litigation remedy

is relatively so inferior as to warrant denying it altogether in the hope that administrative justice will prevail. This is such an instance.

The superior and sensible way to deal with this controversy, involving as it does a multibillion-dollar national and international communications industry that serves millions of people in every state, many of them poor and uneducated, is for the Federal Trade Commission ("FTC") or another federal agency with authority in this area to issue appropriate regulations. Certification is denied.

Plaintiff Ramirez's individual claim, after denial of certification, would be for some $2.00. This is well below the Class Action Fairness Act's $5 million jurisdictional minimum. 28 U.S.C. § 1332(d)(2). Amendment of the complaint is not warranted since the $75,000 claim required for a garden-variety diversity action could not be established, and the individual parties are all citizens of New York. 28 U.S.C. § 1332(a).

Deceptive and abusive practices in the prepaid calling card industry have been widely documented. *See* Part II, *infra*. Senator Bill Nelson of Florida, in his remarks upon introducing the proposed Prepaid Calling Card Consumer Protection Act of 2009, observed that "[u]nfortunately, some providers and distributors of these cards are scamming consumers—by imposing undisclosed junk fees, charging exorbitant rates, and selling cards that expire shortly after consumers start using them." 155 Cong. Rec. S2967 (daily ed. Mar. 10, 2009). Recent law-enforcement investigations have found "unfair and deceptive business practices," including "charging customers for calls where they receive busy signals, imposing weekly 'maintenance fees' that may take away up to 20 percent of the card's overall value, and billing for calls in 3-minute increments." *Id.* Based on empirical research in this area, one expert has concluded that "[b]ecause accurate and complete information typically isn't available, it is impossible for

consumers to make informed decisions before using the cards. . . . [I]nformation is often confusing, incomplete, and even deceptive." Calling Card Consumer Protection Act: Hearing on H.R. 3402 Before the Subcomm. on Commerce, Trade and Consumer Protection of the H. Comm. On Energy and Commerce, 110th Cong. 4 (Sept. 16, 2008) (testimony of Dr. Julia Marlowe, Assoc. Prof. Emeritus, Dep't of Housing and Consumer Economics, Univ. of Georgia) (hereinafter "Marlow Testimony"), *available at* http://energycommerce.house.gov/images/ stories/Documents/Hearings/PDF/Testimony/ CTCP/110-ctcp-hrg.091608.CallingCard. MarloweTestimony.pdf.

Purchasers are typically low-income consumers who cannot afford traditional phone service; many of them are recent non-English-speaking immigrants who use the cards to telephone their families abroad. The industry's problems are of special concern because the cards are widely marketed to this particularly vulnerable group. *See* Mark E. Budnitz, Martina Rojo & Julia Marlowe, *Deceptive Claims for Prepaid Telephone Cards and the Need for Regulation*, 19 Loy. Consumer L. Rev. 1, 2, 13 (2006).

The industry's deceptive practices have been the subject of extensive, repetitive private litigation as well as repeated enforcement actions by the FTC and several state Attorneys General. *See* Part IV, *infra*. Conflicting regulation in a number of states would be superseded by the proposed federal Prepaid Calling Card Consumer Protection Act of 2009. *See* Part V, *infra*.

Despite its mission "to prevent persons, partnerships, or corporations . . . from using . . . unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(2), neither the FTC nor any other governmental agency has comprehensively addressed the serious problems raised by the instant litigation. Plaintiff's allegations present issues better addressed and resolved on a uniform national basis, rather than by piecemeal state-law-based litigation. While

4

utilization of cy pres or the fluid recovery doctrine might provide a viable remedy with some benefit to the class and to society, this is the unusual situation where the present action's limited patchwork repairs are not worth the costs or benefits of allowing the case to go forward.

## II.     Prepaid Calling Card Industry

Prepaid calling cards are sold by convenience stores, gas stations, and other retailers in denominations as small as two dollars. The cards represent a credit that may be used to obtain telephone calling time from any phone. Most cards display a local or toll-free access number and a personal identification number ("PIN"). Users call the access number and enter the PIN. The balance of value on the card is then applied toward the user's call.

Companies that provide service for the cards use the PIN to keep track of how much value—measured in dollars, minutes, or other units—remains on each card. Once the balance on a card is depleted, the user's call is terminated. *See generally* Fed. Trade Comm'n, FTC Facts for Consumers, Buying Time: The Facts About Pre-Paid Phone Cards (Mar. 2008), *available at* http://www.ftc.gov/bcp/edu/ pubs/consumer/products/pro04.shtm; *see also Adighibe v. Clifton Telecard Alliance*, No. 07-CV-1250, 2008 WL 940777, at *1 (D.N.J. Apr. 7, 2008) (describing operation of prepaid calling cards); Appendix 2, DOJ Report.

These cards take advantage of modern technology, permitting consolidation of communications using many available connecting resources in an efficient way. They offer convenience and relatively low per-minute rates, particularly for international calls. In recent years, the prepaid calling card industry has mushroomed into a large international industry. *See* Brian Grow, *Talk Isn't So Cheap on a Phone Card*, Bus. Week, July 23, 2007, at 64 (estimating in July 2007 that $4 billion in prepaid calling cards were sold each year).

A complex division of labor structures the trade. Different companies or corporate affiliates each perform distinct roles. *See generally* Consumer & Governmental Affairs Bureau, Fed. Commc'ns Comm'n, Pre-Paid Phone Cards: What Consumers Should Know (Nov. 6, 2008), *available at* http://www.fcc.gov/cgb/consumerfacts/prepaidcards.html; *see also* Aug. 31, 2009 Hr'g Tr. at 5-18 (statements of Dollar's counsel). Domestic and foreign telephone companies own the local and international telephone or internet lines and satellite systems that actually carry telephone calls. Minutes of calling time are purchased from these telephone companies by resellers, who shop among hundreds of worldwide companies seeking the best rates for different destinations. The resellers then sell the calling time in bulk to service providers who create and issue prepaid calling card PINs.

It is these service providers, represented by defendant Enterprise, who assign monetary values to the PINs, set the per-minute rates at which calling time is charged to users, provide access via local or toll-free phone numbers printed on the cards, and often supply toll-free customer service to users. The service providers do not, however, typically print and distribute the cards themselves. Rather, they sell PINs to distributors at a discount from the assigned face value. These distributors—sometimes also called "wholesalers"—print calling cards bearing the service providers' PINs and access numbers. The distributors then market the cards by selling them to convenience stores and other retailers. The retailers finally vend the cards to consumers for the face value assigned to them by the service provider. It is unclear whether it is the legal duty of the service provider (who issues the PINs and provides calling service) or the distributor (who prints the cards and distributes them to retailers) to make disclosures in connection with a particular card. *See* Part III, *infra*.

Law enforcement agencies and researchers investigating the industry have discovered widespread discrepancies between the amount of calling time claimed in advertising and marketing materials, and the calling time actually available to card users. In tests conducted by the FTC in connection with recent enforcement actions, the cards were found to provide half or less than half of the advertised minutes. Press Release, Fed. Trade Comm'n, Prepaid Calling Card Distributor Agrees to Pay $1.3 Million (June 29, 2009) ("In tests conducted by the FTC, the calling cards on average provided less than half of the advertised calling minutes."), *available at* http://www.ftc.gov/opa/2009/06/cta.shtm; Press Release, Fed. Trade Comm'n, Companies Agree to Pay $2.25 Million as Part of FTC Crackdown on Fraud in the Prepaid Calling Card Industry (Feb. 10, 2009) ("The FTC's testing showed that consumers received only about half the advertised minutes."), *available at* http://www.ftc.gov/opa/2009/02/alternatel.shtm. Surveys of a range of prepaid cards by the nonprofit Hispanic Institute yielded similar results. *See* Hispanic Institute, Calling Card Verification Test Plan (2007), *available at* http://thehispanicinstitute.net/files/Test%20Plan.pdf. Another study of calling cards marketed to Spanish-speaking consumers found that "[m]inutes are often deducted for hidden fees, and consequently, consumers do not receive the number of minutes they are told are available. . . . The average actual cost of the cards was 87% higher than the average expected cost." Budnitz, et al., *supra*, at 6-7.

Underlying these findings are often-inadequate disclosures of costs, as well as consumer confusion and complex fee calculations, which involve minute-rounding, per-call fees, periodic retention-of-card fees, and other types of charges and surcharges. *See* Marlow Testimony, *supra*, at 2. Compounding these problems are customer service representatives, theoretically available through toll-free numbers, who often provide incomplete or inaccurate information, or who cannot be reached. *See id.* at 2-3.

## III. Present Litigation

Plaintiff alleges that he himself was cheated out of some portion of the value of a two-dollar card he purchased; that the Dollar companies were greatly unjustly enriched at the expense of many putative class members; and that defendants violated the CFAs of eleven states through deceptive practices. Am. Class Action Compl. and Demand for Jury Trial ("Am. Compl.") ¶¶ 45-62. He seeks monetary damages, a permanent injunction, and a declaratory judgment that Dollar unlawfully failed to disclose material facts about the fees and conditions applying to their cards. *Id.* at 17-18 & ¶ 67.

Certification of two classes, denominated "Class A" and "Class B," is sought. *Id.* ¶ 38. Putative "Class A" includes all persons who purchased Dollar prepaid cards since January 4, 2004; putative "Class B" includes all residents of specified states with "substantially similar" CFAs who purchased Dollar prepaid cards since January 4, 2004. *Id.* Subject matter jurisdiction is based upon the Class Action Fairness Act, 28 U.S.C. § 1332(d). *Id.* ¶ 13.

Defendants move to dismiss plaintiff's amended complaint on the grounds that: (1) the complaint fails to comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the states' CFAs; (2) plaintiff lacks standing to pursue his CFA claims because he will not be able to obtain class certification; and (3) this court lacks subject matter jurisdiction over a number of the CFA claims. The parties were directed to treat the motion as one for summary judgment and to conduct limited discovery.

Preliminary oral argument on defendants' motion was heard on August 31, 2009. At the court's request, a representative of the United States Attorney's Office for the Eastern District of New York was present to address the federal government's interest. After further briefing and a

communication from the government, *see* Part III.B.3, *infra*, oral argument was renewed on November 5, 2009.

    *A.    Facts*

    Plaintiff purchased a two-dollar "Langosta" brand prepaid calling card (the "Langosta card") in June 2007 in Great Neck, N.Y. Decl. of Orlando Ramirez ¶ 2. He used the card to place an international call to El Salvador. At the initiation of the call, a voice prompt announced that plaintiff had 48 minutes of calling time. *Id.* ¶ 5. The call terminated after approximately 25 minutes, apparently because the card's balance was depleted. *Id.*

    The Langosta card's packaging materials displayed disclosures in both English and Spanish:

> International calls made to cellular phones and calls via toll-free numbers are billed at higher rates. Maintenance/service fees and other charges may apply. Calls made from US payphone will have a per call fee applied. Application of surcharges and fees may have an effect of reducing total minutes on cards. Prices are subject to change without notice. This card has no cash value. Card expires 3 months after first use or 12 months after activation. Service provided by DPE. . . . For Customer Service issues or calling rate information, please call 1-800-413-0351.

*Id.*, Ex. A.

    The parties are in agreement that the service provider "DPE" identified in this disclosure is defendant Enterprise, and that Enterprise provided the phone service for this card. Defendants assert that although the card was serviced by Enterprise, the card itself was distributed by a third-party distributor—unrelated to the Dollar companies—that purchased the PIN number from Enterprise and printed and distributed the Langosta card. Decl. of Abe Greenfield ("Greenfield Decl.") ¶ 7; Reply Decl. of Abe Greenfield ("Greenfield Reply Decl.") ¶¶ 16-22. The card was,

it is contended by defendants, "neither printed, designed, marketed, nor distributed by Enterprise." Greenfield Reply Decl. ¶ 22.

Enterprise and the other Dollar companies are all headquartered at the same location in Brooklyn, New York. Am. Compl. ¶ 11. The President of Enterprise provided a declaration describing the roles of each of the Dollar companies as follows:

> [The Dollar companies are] involved in the telecommunications industry. Defendant DPC purchases access to long distance telecommunications service from telecommunications carriers ("Carriers") and resells long distance telecommunications services to other Carriers. Defendant Enterprise is itself an independent licensed Carrier, and the largest customer of DPC.
>
> Enterprise resells its long distance services to a network of independent wholesalers of prepaid calling cards nationwide ("Wholesalers"). Enterprise provides the Wholesalers with telephone access numbers and personal identification numbers ("PINs") that are assigned by the Wholesalers to prepaid calling cards ("Cards") the Wholesaler designs and prints. A caller holding such a Card may access telecommunications time by dialing the appropriate telephone access number and PIN number associated with the Card. . . .
>
> Relevant here is the fact that neither DPC nor Enterprise sells prepaid calling Cards. DPC sells long distance minutes to other Carriers, and thus has no involvement in the calling card business other than as a supplier of wholesale long distance services to its customer Enterprise. Enterprise, in turn, resells long distance services, packaged in the form of PINs, to independent Wholesalers nationwide. These Wholesalers themselves print Cards bearing Enterprise PINs. *It is the Wholesalers, not Dollar, that design and market the Wholesalers' Cards. The Wholesalers, not Enterprise, disclose rates and charges to consumers.*
>
> Dollar does not sell Cards to individual consumers such as the plaintiff in this action, and does not advertise or market Cards to consumers. Dollar does not make any representations about Cards to consumers. The complaint in this action identifies a private label calling Card, owned and designed by an independent Wholesaler. Enterprise does not manufacture or design such Cards that are sold to consumers. Rather, Enterprise sells telecommunications time and services to Wholesalers. It is these Wholesalers who manufacture Cards or arrange for their

10

> manufacture. Except for certain exceptional instances not relevant here, it is the Wholesalers who design the Cards, determine the content of disclosures or other copy appearing on Cards and market Cards for sale to consumers. *The Wholesalers, not Enterprise, determine the form of image appearing on Cards and Card marketing materials and advertisements, including any disclosure of applicable rates and surcharges.*

Greenfield Decl. ¶¶ 3-4, 6-7 (emphases added).

Dollar maintains that it was not responsible for printing the Langosta card, or for any disclosures on the card, on its packaging, or in associated advertisements. Plaintiff disputes this on the basis of unsworn discovery responses by a third-party distributor of Dollar cards from an unrelated litigation. *See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 4-5. This distributor indicated that "Dollar composes the disclaimers to be put on card and advertisements [and] sets the fees and other charges applicable to the cards." *Id.* at 4. Arguing that this suggests that Dollar may have been responsible for the Langosta card's disclosure language, plaintiff requested further discovery. *Id.* at 5. Further discovery on this issue would not affect the court's decision on the present motion.

According to plaintiff, defendants have "systematically, intentionally, and surreptitiously . . . failed to disclose" information on Dollar phone cards necessary for a reasonable consumer to understand the cards' pricing structure. Am. Compl. ¶ 29. The allegedly undisclosed information includes:

a. The price the consumer pays per billing increment (10¢ per minute);
b. That Defendants impose a "per call" fee on all calls using a Dollar Card and the exact amount of the fee;
c. That Defendants impose a higher rate for calls to mobile telephones and the amount of that rate; and
d. That Defendants impose a "weekly fee" of $ 0.60 and the circumstances in which it applies.

11

*Id.*

It is contended that Dollar's deceptive practices prevented putative class members from understanding the true value of Dollar's calling cards and from making informed purchasing decisions:

> Had Defendants clearly and conspicuously disclosed how much the Card is really worth in terms of what the consumer pays per minute of calling time and that the stated monetary value of Dollar Phone Cards would be greatly reduced or eliminated <u>not</u> by calling time but by Defendants undisclosed fees, surcharges and conditions, Plaintiff and Class Members would not have purchased them. Defendants have uniformly deprived them from making informed decisions about buying Defendants' Cards.

*Id.* ¶ 6.

     *B.*     *Procedural Positions*

        1.     Defendants

Defendants moved to dismiss plaintiff's complaint on three grounds. First, that plaintiff's complaint fails to comply with the pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the states' CFAs. Mem. of Law in Supp. of Defs.' Mot. to Dismiss Am. Compl. at 16-27. They argue that plaintiff did not sufficiently allege why any of the Dollar companies owed him a duty to disclose. *Id.* at 19-21. Under the states' CFAs, the claim that Dollar did not reveal price-per-minute information is said to fail, because price per minute varies and could not have been known at the time the Langosta card was sold. *Id.* at 21-23. According to defendants, fees were adequately disclosed on the card and its packaging materials, and allegations that these disclosures were inadequate are excessively vague. *Id.* at 23-26. Applying the same arguments, defendants conclude that plaintiff's claims of unjust enrichment and for declaratory relief are not pled with sufficient particularity. *Id.* at 26-27.

12

Second, defendants take the position that plaintiff lacks standing with respect to the state CFA claims. They argue that because the states' CFAs are not sufficiently similar to one another, putative "Class B" fails Rule 23's commonality requirement. *Id.* at 27-30.

Third, defendants argue that subject matter jurisdiction over a number of the CFA claims is lacking because certain CFAs authorize actions only in state court, impose procedural requirements before a claim may be brought, and time-bar members of putative "Class B." *Id.* at 30-38.

After limited discovery, defendants offered several additional arguments in support of summary judgment. They contend that plaintiff cannot show that he was injured by defendants' alleged nondisclosures because plaintiff had no belief at the time he purchased the Langosta card about the number of minutes of calling time on the card. Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. at 14-16. Plaintiff's claims against defendants Access, DPC, and Services are also said to fail because no facts are alleged with respect to these defendants other than their affiliation with Enterprise, and because evidence shows that only Enterprise was involved in providing calling service for the Langosta card. *Id.* at 19-20. The unsworn discovery responses of an unrelated distributor, which may suggest that the Dollar companies were responsible for the disclosures that appeared on Dollar cards, are said to be inadmissible and thus insufficient to defeat summary judgment. *Id.* at 20-22. In defendants' view further discovery is unwarranted. *Id.* at 23-25.

### 2. Plaintiff

To defendants' arguments on the motion to dismiss, plaintiff responds, first, that his complaint meets the requirements of Rule 9(b) by adequately alleging that defendants failed to disclose material facts concerning the terms of service of the Langosta card. Defendants' other

13

arguments based on failure to meet pleading standards are contended to be based on factual disputes that have no bearing on the adequacy of plaintiff's pleadings. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Am. Compl. at 7-12.

Second, plaintiff contends that the arguments that "Class B" cannot be certified, that jurisdiction is lacking under some state CFAs, and that some class members' claims are barred by applicable statutes of limitations, are addressed to the issue of certification rather than to the adequacy of plaintiff's pleading, and are thus premature. *Id.* at 13-14, 16.

Third, plaintiff argues that pre-filing requirements imposed by certain state CFAs are procedural requirements that are not applicable in federal court, and that the language in CFAs regarding where private actions may be brought is permissive rather than prohibitive, and does not bar prosecuting claims in federal court. *Id.* at 14-16.

In opposing summary judgment plaintiff points out that he has had only limited and incomplete discovery. Conceding that the distributor's unsworn discovery responses are inadmissible, plaintiff argues that "[i]f presented in the form of admissible evidence, these facts could create a genuine issue of material fact," contradicting statements in declarations submitted in support of defendants' summary judgment motion. Pl.'s Summ. J. Br. at 4. Plaintiff requests further discovery. *Id.* at 5.

### 3.    Federal Government

At the court's request, the United States Attorney's Office for the Eastern District of New York was present at the August 31 and November 5 hearings through an Assistant United States Attorney. *See* Aug. 31, 2009 Hr'g Tr. at 3; Nov. 5, 2009 Hr'g Tr. at 3. He stated that the FTC has been active in bringing deceptive practices cases against prepaid calling card distributors. Aug. 31, 2009 Hr'g Tr. at 19-20. The government was requested to submit a report regarding

14

any applicable federal regulations, federal enforcement activity, and the policies of the FTC, the Federal Communications Commission ("FCC"), and any other concerned federal agency. *Id.* at 35-37.

The United States Attorney, based upon information provided by the FTC and the FCC, by letter dated October 20, 2009, responded to the court's request. *See* Appendix 2, DOJ Report. It is apparent that the federal government has made substantial efforts to assist purchasers of phone cards by its publications and actions to prevent misleading conduct. Yet, the federal government is inhibited in providing full and uniform protections by a lack of explicit authority. A bill (among others) to provide administrative authority has been introduced as S.562, 111th Congress, 1st Session, "[t]o require accurate and reasonable disclosure of the terms and conditions of prepaid telephone cards and services, and other purposes." Appendix 2, DOJ Report, Attachment D.

Pursuant to its present powers, the FTC has established a joint federal-state task force to assist it, and thirty-five state Attorneys General and other state agencies, in bringing some order and comprehensive protection to consumers in this field. *See* Appendix 2, DOJ Report at 4. The Commission has testified in favor of federal legislation which would centralize and improve its power to regulate the calling card industry. *Id.* at 8.

At the final hearing on November 5, 2009, a representative of the FCC pointed out that, based on comments it had received concerning the prepaid calling card industry in response to an August, 2009 Notice of Inquiry, it was now considering extending its regulation of the industry. *See* Nov. 5, 2009 Hr'g Tr. at 5; *see also* Press Release, Federal Communications Commission, FCC Seeks Comment on Additional Opportunities to Protect and Empower Consumers in Communications Marketplace (Aug. 27, 2009), *available at* http://hraunfoss.fcc.gov/

15

edocs_public/attachmatch/DOC-293117A1.pdf; Federal Communications Commission, Notice of Inquiry, In the Matter of: Consumer Information and Disclosure (CG Docket No. 09-158), Truth-in-Billing and Billing Format (CC Docket No. 98-170), IP-Enabled Services (WC Docket No. 04-36) (Aug. 27, 2009), *available at* http://www.fcc.gov/Daily_Releases/Daily_Business/ 2009/db0828/FCC-09-68A1.pdf; Letter of United States Attorney, Nov. 5, 2009, Exs. B & C (comments directed to the regulation of prepaid calling cards).

## IV.    Related Litigation

Deceptive practices in the prepaid calling card industry have been the subject of private litigation, enforcement actions by the FTC, inquiry by the FCC, and administrative actions by state Attorneys General. Several of these proceedings are ongoing. In other cases, proposed or approved settlement agreements or stipulated final orders have been agreed upon. These agreements and orders differ in how they redress past injuries and seek to reform future conduct.

### A.     Private Plaintiffs

The present litigation is one of at least twenty two private actions filed in federal courts since 2003 involving prepaid calling cards. *See* Appendix 1, Other Phone Card Cases. These cases have been before some fifteen different judges in six different district courts. *Id.* A number have been dismissed without prejudice, many have settled, and some are still pending. *Id.* The Dollar companies are defendants in three such actions. *Id.* Plaintiff Ramirez is a plaintiff in eight such actions, represented in each by the same counsel as in the present action. *See id.; see also Ramirez v. Lycatel, LLC*, 07-CV-5533 (D.N.J.); *Ramirez v. Friendly Telecom, Inc.*, 07-CV-5589 (D.N.J.); *Ramirez v. Roslyn Telco Group, Inc.*, 07-CV-5590 (D.N.J.); *Ramirez v. SDI Card.com, Inc.*, 07-CV-5591 (D.N.J.); *Torres-Hernandez v. CVT Prepaid Solutions, Inc.*, 08-CV-1057 (D.N.J.); *Torres-Hernandez v. STI Phone Card, Inc.*, 08-CV-1089 (D.N.J.);

16

*Ramirez v. Epana Networks, Inc.*, 08-CV-4040 (D.N.J.); *Ramirez v. iBasis, Inc.*, 08-CV-5125 (E.D.N.Y.).

Proposed or approved settlement agreements in three cases indicate that the terms on which these cases have settled, or are likely to settle, vary significantly. In *In re IDT Corp. Calling Card Terms Litig.*, No. 03-CV-375 (D.N.J.), the court approved a settlement agreement under which the defendants agreed to provide $2 million in donations to charities, and to create two pools of funds totaling $20 million for refunds to class members who purchased calling cards, to be distributed in $0.50 increments according to detailed procedures. *See* Class Settlement Agreement and Release, Aug. 7, 2006, §§ 6(d) & (e), Ex. 1 to Certification of Pamela E. Kulsrud in Supp. of Mot. for Preliminary Approval of Class Settlement, *In re IDT Corp. Calling Card Terms Litig.*, No. 03-CV-375 (D.N.J. Aug. 18, 2006).

The *IDT* settlement contains extensive provisions governing the defendants' future conduct. It requires specific disclosures regarding "non-usage fees" and higher rates for calls made via toll-free access numbers, *id.* § 6(b)(1)-(2), and mandates customer service and rate-inquiry numbers to be included on calling cards, packaging, and posters, *id.* § 6(b)(3). And it requires the defendants to "submit for consideration to the New Jersey Attorney General's Office proposed uniform calling card disclosure regulations and . . . [to] cooperate with the [New Jersey] Attorney General's Office," *id.* § 6(c).

In *Monday v. Locus Telecomms., Inc.*, No. 07-CV-2659 (D.N.J.), the court approved a settlement agreement under which the defendant agreed to create a $300,000 fund for donations to charities, to provide $200,000 in product discounts to class members, and to provide refunds of up to approximately $3.7 million for class members who bought calling cards, to be distributed according to procedures similar to those in the *IDT* settlement. The *Monday*

17

settlement contains no provisions governing the defendant's future conduct. *See* Class Settlement Agreement and Release, July 30, 2008, § 6, Ex. B to Certification of Peter J. Gallagher in Supp. of Def.'s Mot. for Final Approval of Settlement and Certification of Class, *Monday v. Locus Telecomms., Inc.*, No. 07-CV-2659 (D.N.J. Mar. 6, 2009).

A proposed settlement agreement in *Coppolino v. Total Call Int'l, Inc.*, No. 08-CV-539 (D.N.J.) would provide refunds of up to $1.9 million for class members who bought calling cards, to be distributed according to procedures similar to those in the *IDT* settlement. [Proposed] Class Settlement Agreement and Release § 6, Ex. 1 to Certification of James E Cecchi, *Coppolino v. Total Call Int'l, Inc.*, No. 08-CV-539 (D.N.J. June 26, 2009). The *Coppolino* agreement would include the following provision governing the defendant's future conduct:

> [Defendant] shall, on a forward going basis, comply with the following in connection with its sale, distribution, and manufacturing of prepaid calling cards: (1) when advertising rates, any limitations for said rates must be included on the advertisement; (2) all fees for use of the prepaid calling card must be printed on the card; and (3) when making statements regarding amount of minutes remaining for a call, doing so accurately and inclusive of all fees being incurred on the call.

*Id.* § 7.

B.    *FTC Action*

The FTC has brought at least three recent enforcement actions against prepaid calling card distributors on the basis of alleged deceptive practices. *See* Appendix 1, Other Phone Card Cases; Appendix 2, DOJ Report at 2-4. It describes these actions as "part of an ongoing FTC crackdown on fraud in the prepaid calling card industry," in which it has "established a joint federal-state task force concerning deceptive marketing practices . . . , and continues to

18

investigate other prepaid calling card operations." Press Release, Fed. Trade Comm'n, Prepaid Calling Card Distributor Agrees to Pay $1.3 Million (June 29, 2009), *available at* http://www.ftc.gov/opa/2009/06/cta.shtm.

One FTC action is pending in this court. *Fed. Trade Comm'n v. Diamond Phone Card, Inc.*, 09-CV-3257 (E.D.N.Y.) (filed July 29, 2009). Two other cases have settled in the past year, resulting in stipulations that provide for monetary penalties, permanent injunctions, and detailed compliance, monitoring, and recordkeeping obligations. *See* Stipulated Final Order for Permanent Inj. and Monetary J. as to All Defs., *Fed. Trade Comm'n v. Alternatel, et al.*, No. 08-CV-21433 (S.D. Fla. Feb. 10, 2009) (hereinafter the "*Alternatel* Order"); Stipulated Final Order for Permanent Inj. and Monetary J. as to Defs. Clifton Telecard Alliance One LLC and Mustafa Qattous, *Fed. Trade Comm'n v. Clifton Telecard Alliance One LLC, et al.*, No. 08-CV-1480 (D.N.J. June 18, 2009) (hereinafter the "*Clifton* Order").

The *Alternatel* and *Clifton* Orders (together, the "FTC Orders") are substantially identical. In each order, a monetary judgment for equitable relief is entered jointly and severally against the defendant distributors. *See Alternatel* Order § III; *Clifton* Order § III. The defendants are enjoined from falsely representing the number of calling minutes on prepaid calling cards, and are required to make "clear and prominent" disclosures of all material limitations, including card expiration dates, the existence and amounts of fees, and limitations on the periods during which calling minutes or per-minute rates are available. *See Alternatel* Order § II; *Clifton* Order § II.

Under the FTC orders, the defendant distributors assume extensive and detailed responsibilities to monitor for a period of five years the accuracy and appropriateness of their calling cards disclosures. *See Alternatel* Order § V; *Clifton* Order § VI. Procedures must be

implemented and maintained to ensure distribution of appropriate point-of-sale materials, and to confirm that only appropriate materials are displayed by retailers. *See Alternatel* Order § V.A-G; *Clifton* Order § VI.A-E. Defendants are also obligated to routinely monitor the rates, limitations, fees, and charges imposed by the service providers who service their cards, and to ensure that point-of-sale disclosures remain consistent with service providers' policies. *See Alternatel* Order § V H-I; *Clifton* Order § VI.C, F-G. Tests of random samples of prepaid calling cards must be conducted by defendants to confirm the rates and fees applied. *See Alternatel* Order § V.H.2; *Clifton* Order § VI.F.2.

The FTC Orders require the defendant distributors to maintain, for a period of seven or eight years, records, including all complaints and refund requests, all marketing and advertising materials, and all documents such as call logs that reflect advertised number of call minutes or per-minute rates and the actual number of talk minutes delivered. *See Alternatel* Order § VIII (eight years); *Clifton* Order § VIII (seven years). For a period of four or five years, the defendant distributors are to report specified events to the FTC and to submit compliance reports at determined intervals. *See Alternatel* Order § VII (five years); *Clifton* Order § VII (four years). The FTC will monitor the defendants' compliance with their obligations. *See Alternatel* Order § VI; *Clifton* Order § V. Other provisions address website representations, toll-free customer service, and complaint handling, *See Alternatel* Order § V.J-M; *Clifton* Order § VI.H-K.

C.      *State Attorneys General*

Attorneys General, including those of California, Florida, New Jersey, New York, and Texas, have been active in combating deceptive practices in the prepaid calling card industry. *See* Appendix 2, DOJ Report at 4 & n.5; *see also, e.g.*, State Telecom Activities, Commc'ns Daily, June 2, 2008, *available at* 2008 WLNR 10563594 (describing Texas Attorney General's

suit alleging prepaid calling card company "consistently delivered only 40 percent of the minutes it promised to customers on its cards and in its ads"); Press Release, New York State Attorney General's Office, Pre-Paid Phone Card Sweep Cleans up Deceptive Posters (Apr. 12, 2001), *available at* http://www.oag.state.ny.us/media_center/ 2001/apr/apr12c_01.html (announcing settlements with five companies accused of "luring people to buy [prepaid calling] cards by promising extremely low per-minute rates without properly disclosing actual costs").

Most active in recent years have been the Attorneys General of Florida and New Jersey. Between June and December 2008, the Florida Attorney General reached settlements with thirteen different prepaid calling card companies, and in March 2009 the New Jersey Attorney General reached settlements with seven companies. In both states, the consent decrees required the settling companies to reform their business practices, including their disclosures of fees, charges, and other material terms. The New Jersey and Florida settlements impose similar but not identical obligations.

The New Jersey settlements include requirements that that all advertised minutes or rates be available to the consumer; that all minutes announced in voice prompts provided when a call is placed be actually available for the call; that all fees and surcharges be disclosed on the calling card or its packaging, as well in any advertisements; and that policies for rounding time off for billing purposes be clearly disclosed. *See* Press Release, New Jersey Dep't of Law & Safety, Div. of Consumer Affairs, New Jersey Reaches Settlements With Seven Companies Regarding Pre-Paid Calling Cards (Mar. 17, 2009), *available at* http://www.njconsumeraffairs.com/press/ prepaid.htm. Other terms require that toll-free customer service be available at a clearly disclosed number, and that specified documents and records be available for inspection for three

years. *Id.* The settlement terms "mirror requirements contained in a new state law governing pre-paid calling cards that took effect last year." *Id.*; *see* N.J. Stat. Ann. §§ 56:8-175 to 284.

Florida's settlements require that "hidden fees or misleading minute calculations" not be applied; that there be a "clear representation of the exact number of minutes available" to the consumer; that there be "no surcharges resembling taxes"; and that calls only be rounded up to the nearest minute rather than to longer intervals. *See, e.g.,* Press Release, Florida Attorney General Bill McCollum, McCollum Announces Prepaid Calling Card Settlements, Industry-Wide Reform (June 11, 2008), *available at* http://myfloridalegal.com/newsrel.nsf/newsreleases/ 79C6666DB24608D785257465004EC901. The Attorney General's Office has stated that it "will continue to work with these companies in a continuing effort to monitor misleading advertising within the prepaid long distance phone card industry and some investigations are still ongoing." *Id.*

Defendant Enterprise is among the companies that have settled with both the Florida and the New Jersey Attorneys General. *See* Letter of Dollar's Counsel, Oct. 14, 2009, Docket Entry No. 34 (enclosing copies of settlement agreements between defendant Enterprise and the Florida Attorney General and New Jersey Division of Consumer Affairs, Office of Consumer Protection).

## V.     Regulation of Prepaid Calling Card Industry

### A.     Federal Regulation

The regulatory regime governing the prepaid calling card industry is incomplete and inconsistent. "[N]either the Federal Communications Commission nor the Federal Trade Commission has taken any action to impose upfront nationwide consumer protection requirements on this industry." 155 Cong. Rec. S2967 (daily ed. Mar. 10, 2009) (Statement of

Sen. Bill Nelson). A major source of the problem with federal oversight of the calling card industry is the division of regulatory authority. The FCC has statutory authority over common carriers, like Dollar, that provide prepaid calling card interstate telecommunications services. *See* Appendix 2, DOJ Report at 1-2, nn.3-4 (citing 47 U.S.C. § 201(b)). The FTC has jurisdiction over card wholesalers and distributors, through its authority to initiate federal district court proceedings to enjoin violations of the Federal Trade Commission Act, which prohibits deceptive or unfair acts or practices in or affecting commerce. *See id.*; 15 U.S.C. § 45(a)(2). However, the Federal Trade Commission Act exempts common carriers subject to the Communications Act from its prohibitions on unfair or deceptive acts or practices. *See* Appendix 2, DOJ Report at 1 n.3; 15 U.S.C. § 45(a)(2). Neither the FCC nor the FTC has authority over the entire prepaid calling card industry, including both carriers and distributors.

      B.     *Existing State Statutes*

A number of states have laws specifically addressed to the industry, but the large majority rely only on their general consumer protection laws. Those states that have industry-specific laws impose differing requirements and rules. The federal Prepaid Calling Card Consumer Protection Act proposed this year would impose a uniform national system of regulation. *See* Appendix 2, DOJ Report, Attachment D; Part V.C, *infra.*

"In most states, there is little or no regulation of prepaid telephone cards. Thus most states do not require phone card companies to disclose essential information and substantive rights that ensure consumers receive satisfactory service." Budnitz, et al., *supra*, at 2. Only a minority of the states have laws specifically addressed to the prepaid calling card industry. *See* Brian Grow, *Talk Isn't So Cheap on a Phone Card*, Bus. Week, July 23, 2007, at 64 (reporting that as of July 2007, "[o]nly 11 states, including California, Connecticut, Florida, and Illinois,

23

have laws on calling cards."); *see also, e.g.*, Al. Pub. Serv. Comm'n Rule T-18.1; Alaska Admin.

Code tit. 3, § 52.377; Cal. Bus. & Prof. Code § 17538.9; Conn. Gen. Stat. Ann. § 42-370; Fla.

Admin. Code Ann. r. 25-24.900 to 935; 815 Ill. Comp. Stat. § 505/2TT; Mo. Code Regs. Ann.

tit. 4, § 240-32.130 to 170; N.J. Stat. Ann. §§ 56:8-175 to 284; N.Y. Pub. Serv. Law § 92-f; 16

Tex. Admin. Code § 26.34; Wash. Admin. Code § 480-120-264. In states that have no industry-

specific laws, general consumer protection laws provide the only applicable regulations. *See*

Grow, *supra* ("Other states rely on generic consumer protection regulations, but those are rarely

applied to cards."); *see also* Budnitz, et al., *supra*, at 11-12.

"There is no uniformity in the state law regulating phone cards. States have taken a wide

variety of approaches. Some have imposed minimal regulation, while others subject the industry

to many specific requirements." Budnitz, et al., *supra*, at 17. To take two examples at opposite

ends of the spectrum, the Alabama rules governing prepaid cards are simple and concise, and

mostly concern information which must be displayed on the card or its packaging. *See* Al. Pub.

Serv. Comm'n Rule. T-18.1. In contrast, the California statute is long and detailed, and covers a

variety of topics such as the information that must be disclosed in advertisements, the use of

languages other than English, and required voice prompts prior to calls. *See* Cal. Bus. & Prof.

Code § 17538.9.

The problem posed in controlling abuses is thus not only that there are different levels of

specificity, but that one state often regulates conduct that another state does not. California and

New Jersey regulate the content of advertisements for prepaid calling cards. *See* Cal. Bus. &

Prof. Code § 17538.9(b)(1); N.J. Stat. Ann. § 56:8-176. Other states do not regulate advertising.

*See, e.g.*, N.Y. Pub. Serv. Law § 92-f; 16 Tex. Admin. Code § 26.34. California and Texas

require verbal prompts at the beginning of each call, stating the number of minutes available for

that call. Cal. Bus. & Prof. Code §§ 17538.9(b)(8); 16 Tex. Admin. Code § 26.34(g)(1). Texas, but not California, requires an additional voice prompt at least one minute before the balance on the card is depleted. 16 Tex. Admin. Code § 26.34(g)(1). Other states do not have voice prompt requirements. *See, e.g.*, N.Y. Pub. Serv. Law § 92-f; Wash. Admin. Code § 480-120-264. California and Texas, but not other states, require that if a card is marketed in a language other than English, disclosures also be made in that language. *Compare* Cal. Bus. & Prof. Code §§ 17538.9(b)(6) and 16 Tex. Admin. Code § 26.34(f)(1), *with, e.g.*, N.Y. Pub. Serv. Law § 92-f; Wash. Admin. Code § 480-120-264.

Even where states regulate the same conduct, their specific rules may differ in details. The various states' disclosure rules illustrate these disparities. "There is no national uniform format for disclosures on phone cards, unlike disclosure for credit and debit card transactions." Budnitz, et al., *supra*, at 22. In California the disclosure requirements are highly detailed:

> In California, the required disclosures on the card or packaging include the "value of the card" as well as any surcharges, taxes or fees. The California statute provides a list of fees, illustrating the complexity of the product's pricing, and how sellers use a variety of different terms, all of which amount to additional cost to the consumer. Further, there are different requirements for disclosing surcharges for international calls. The seller also must disclose the minimum charge per call, the billing decrement, the recharge policy, if any, and the refund policy, if any.
> . . . The statute requires the value of the card and the amount of the charges to be disclosed on the card or its packaging all in the same format. Moreover, if the value of the card is expressed in minutes, those minutes must be designated as either domestic or international. Finally, that designation must be printed on the same line as the value of the card in minutes or on the line immediately following.

Budnitz, et al., *supra*, at 22-23 (footnotes omitted; describing what are now Cal. Bus. & Prof. Code §§ 17538.9(a)(1), (b)(3) & (b)(16)). Alabama's more general rules require only disclosure

of the value of the card, the name of the service provider, the expiration date, a customer service number, and applicable rates and fees. Al. Pub. Serv. Comm'n Rule. T-18.1. Connecticut's statute requires disclosure of all surcharges and fees, formulas for rounding of calling time, restrictions on the use of the card, and a toll free customer service number. Conn. Gen. Stat. Ann. § 42-370(b). Each state has its own different set of disclosure requirements.

A pattern of broad similarities combined with minor discrepancies is repeated in other areas. States apply different rules regarding when cards that display no expiration date are deemed to expire; whether live customer service representatives must be available, and at what hours; what information customer service representatives must be able to provide; how rounding of calling-time increments may be done; what standards govern consumers' refund requests; and so on. *See* Budnitz, et al., *supra*, at 24-28.

Uniform compliance is difficult for companies operating in more than one state. The result is a confusing and sometimes inconsistent patchwork of state-law rules. *See generally id.* at 18-28.

C.      *Proposed Federal Prepaid Calling Card Consumer Protection Act of 2009*

Currently before the United States Senate's Committee on Commerce, Science, and Transportation is the Prepaid Calling Card Consumer Protection Act of 2009 (the "Proposed Act"). S. 562, 111th Cong. (2009); Appendix 2, DOJ Report, Attachment D; *see also* Letter of United States Attorney, Nov. 6, 2009 (stating that a bill similar in many respects to S. 562, the Calling Card Consumer Protection Act, H.R. 3993, 111th Con. (2009), was introduced in the House of Representatives on November 2, and attaching a copy of H.R. 3993).

The Proposed Act would require the FTC to establish and enforce a uniform nationwide system of regulation of the prepaid calling card industry. For purposes of enforcing the Proposed

26

Act, the FTC would acquire jurisdiction over prepaid calling card service providers, pursuant to a carve out of the Federal Trade Commission Act's exemption for "common carriers." *See* Proposed Act § 5(b) ("Notwithstanding section 5(a)(2) of the Federal Trade Commission Act (15 U.S.C. 45(a)(2)), communications common carriers shall be subject to the jurisdiction of the [FTC] exclusively for the purposes of this Act . . . .").

Under the Proposed Act the FTC would prescribe regulations requiring service providers or distributors to disclose specified information at the point of sale, including the value of the card, the amount and application of all fees, refund and expiration rules, limitations on use of the card, the name of the service provider, a toll-free customer service number, and other material terms and information. *See id.* § 3(a). These disclosures would be printed "in a clear and conspicuous location on the card, or on the packaging of the card, so as to be plainly visible to a consumer," either in English or in any other language predominately used. *Id.* §§ 3(b)(1), (4). Similar disclosures would be required in advertisements and promotional materials. *Id.* § 3(b)(3). The Proposed Act specifically provides that generalized disclosures regarding unspecified fees are inadequate: service providers and distributors "may not avoid liability under this section by stating that the displayed, announced, promoted, or advertised minutes, or the per-minute rate to a specific destination, are subject to fees or charges." *Id.* § 4(c).

Prohibited for a service provider or distributor would be: deduction from a card's balance of any fee in a way not properly disclosed, *id.* §§ 4(a)(1) & b(1); providing fewer minutes of calling time than the number advertised or to charge a per-minute rate higher than advertised, *id.* §§ 4(a)(2) & b(2); and providing fewer minutes of calling time than the number announced in a voice prompt at the time a call is placed, *id.* §§ 4(a)(3) & (b)(3). Service providers would be prevented from deducting charges for busy or unanswered calls, and from deducting per-minute

charges based on increments greater than one minute. *Id.* §§ 4(a)(5) & (6). Violations would be punishable under the Federal Trade Commission Act. *Id.* § 5.

A uniform national system of regulation would be required by the Proposed Act's preemption, with certain exceptions, of any inconsistent state laws, *id.* § 8, and by the FTC's residual authority to "prescribe such other disclosure regulations as the Commission determines are necessary to implement this section." *Id.* § 3(c).

## VI.    Need for Uniform National Regulations

The sale of the Langosta card to plaintiff was governed by New York's prepaid calling card statute. *See* N.Y. Pub. Serv. Law § 92-f. Defendant Enterprise, which provided service for the card, is subject to consent orders at the behest of the Attorneys General of both New Jersey and Florida. To the extent that the Dollar companies service prepaid cards sold in New Jersey, Connecticut, or other states with prepaid calling card laws, they may be subject to conflicting statutory and regulatory requirements of those states. They may also be subject to inconsistent enforcement action by the FTC on the basis of the present Federal Trade Commission Act. The Dollar companies are involved in three other private litigations in the federal courts concerning the cards they service. Meanwhile, plaintiff's counsel is a repeat player, having filed nine similar actions with the same plaintiff against prepaid calling card companies in the federal courts.

This splintered regulatory regime appears to be due in part to the division of federal regulatory authority between the FCC, which has jurisdiction over carriers like Dollar, and the FTC, which has jurisdiction over wholesalers and distributors. *See* Part V.A, *supra*; Appendix 2, DOJ Report at 1-2, 4. Apparently, it is the carrier who sets the rates, imposes fees, and charges and sets the billing increments. *See* Part II, *supra*. It is the plaintiffs' position that, in general, the carrier also chooses the wording on the cards and any promotional materials and takes care of

28

printing the cards, with distributors purchasing the cards at wholesale from the carriers and reselling them to retailers, who in turn sell them to the public.

While the FTC seems to have been active in policing the calling card industry, as is demonstrated in the list of its enforcement actions, *see* Appendix 2, DOJ Report at 2-4, it seems not to have the authority to take any action against those the plaintiffs claim are "the real culprits" in the deceptive practices, the carriers. Pls.' Br. Responding to Draft Memo. & Order and U.S. Gov't Letter, Oct. 30, 2009, at 2. Carriers are regulated by the FCC. The FCC seemingly has not heretofore been active in exercising its power to take affirmative action against carriers selling prepaid calling cards. *See* Appendix 2, DOJ Report at 5-6; *but see* Part III.B.3 (noting the FCC is currently investigating comments it has received regarding the prepaid calling card industry).

Plaintiffs' claim that

> [c]ompany by company, we are reforming this industry by extending the limited statewide regulation that currently exists on a nationwide basis through agreed upon 23(b)(2) injunctive relief. Thus in *Total Call*, Plaintiff's counsel negotiated as part of the settlement a *nationwide* injunction enforcing New Jersey's disclosure rules. Similar provisions are in the settlement agreements with Epana, which was filed on October 29, and Lycatel, which is to be submitted for preliminary approval shortly. The issue, then, is whether it is better to proceed with the tools available and attempt to fashion the best remedy possible under the circumstances, or for the Court to throw up its hands and do nothing. Plaintiff respectfully submits that it is the former.

Pls.' Br. Responding to Draft Memo. & Order and U.S. Gov't Letter, Oct. 30, 2009, at 3. While recognizing the utility of counsel's work, the court respectfully disagrees that this somewhat dysfunctional private method of control of a major national and international communications link through repetitive civil litigations is appropriate.

29

A sprawling, hit-or-miss, costly, and confusing series of civil litigations across many states is an absurd way to control a vital national and international form of communication. It is intolerable in a multi-billion dollar industry affecting the lives of millions of consumers, many of them low-income or recent immigrants to whom telephone contact with loved ones abroad is vital to their own and their families' health and happiness. The industry's problems do not appear to be limited to deceptive acts by a small number of bad actors. Empirical studies of the industry indicate that, in general, "consumers have difficulty obtaining necessary information about prepaid telephone cards before purchase. Information is often unavailable, misleading, and confusing." Budnitz, et al., *supra*, at 42. The present chaotic situation is also harmful to the service providers and distributors, who face widely varied state regulatory regimes, in the absence of clearly announced federal regulations. *Id.*

The issues plaintiff has raised are "national problems that are best dealt with on a uniform nationwide basis both to ensure that consumers can enjoy a basic level of protection wherever they live and to lower compliance costs for the industry." *Id.* at 41. Beyond the injuries that are suffered due to deceptive and abusive industry practices, the lack of a uniform regulatory regime itself disadvantages consumers. "Because of the great variation in the kinds of fees assessed, the difficulty in determining how the fees are assessed, and the lack of standardized wording, meaningful comparison shopping is impossible. Uniformity of information, disclosure and standardized names for fees would help consumers, much the same way that nutritional labeling has provided a mechanism for uniform comparison." *Id.* at 9.

State law variances may be particularly important to many users such as those who are transient harvesters moving from state to state as crops ripen or as other jobs are available. Involved may be complex choice of law issues. For example, if state A, in which the card is

30

bought, requires no announcement of minutes available when a call is placed, but the card is used

in state B, which does require such an announcement, which law should apply?

For the reasons summarized by Professors Budnitz, Rojo, and Marlowe in their study of

the industry, the solution they recommend as most appropriate is a uniform federal system for

regulation and enforcement:

> [F]ederal legislation has several advantages over state regulation.
> The most obvious benefit is complete national coverage. Another
> benefit is uniformity. Complete and uniform national coverage
> helps both the industry and consumers. Many phone card
> companies sell cards in many states. Having one set of rules
> greatly lessens their regulatory burden. Furthermore, many
> companies sell cards on the Internet. A uniform set of rules greatly
> eases their regulatory burden since they are selling to consumers
> nationwide. The phone card industry may mount less opposition to
> a federal law than to state laws because of the advantages of
> having to comply with only one law. They may actually support a
> federal law in the belief it would discourage the majority of states
> that have not yet regulated phone cards from enacting their own
> laws.
>
> In addition, uniform disclosures, standardized terms, and
> the same rights help produce educated consumers. This is
> especially important given the high mobility rates of people who
> live in the United States. Most will live in several states during
> their lifetimes. With a federal law, they do not have to learn a new
> set of rules and definitions every time they move to a new state.
>
> A federal rule may also lead to more effective enforcement
> than state law. An individual state may have great difficulty
> enforcing its laws against companies operating from different
> states, especially those selling on the Internet. Jurisdictional issues
> may frustrate enforcement. Enforcement by a federal agency
> would obviate many of these difficulties.

*Id.* at 14-15 (footnotes omitted). The authors favor a federal statute and regulation through the

FTC. *See id.* 15-16. This is consistent with proposed federal legislation, *see* Part V.C, *supra*, and

apparently with the FTC's view of its own "mission as aggressively monitoring and seeking

compensation on behalf of consumers [through] modern 'enforcement efforts aim[ed] to identify

violators quickly in order to limit consumer harm, to obtain compensation for injured customers, and to modify orders when necessary to provide additional protection for consumers.'" Adam S. Zimmerman, *Distributing Justice* 25 (July 1, 2009) (unpublished draft) (quoting Fed. Trade Comm'n, *The FTC in 2009: The Federal Trade Commission Annual Report* 54 (March 2009), *available at* http://www.ftc.gov/os/ 2009/03/2009ftcrptsv.pdf); *see also* Appendix 2, DOJ Report at 8.

The present action is one of a number of similar civil and administrative proceedings concerning alleged deceptive practices in the prepaid calling card industry. *See supra* Part IV. While the federal administrative system lacks effective control, the courts and states struggle—unsuccessfully—to meet a serious set of national and international communication problems that require a uniform national approach. Piecemeal class action litigation cannot effectively address these issues. *See generally,* Essay, *Compensation for Mass Private Delicts: Evolving Roles of Administrative, Criminal, and Tort Law,* 2001 U. Ill. L. Rev. 947, 960-82 (2001) (discussing appropriate roles of administrative and tort systems in protecting citizens and consumers from mass harms).

Allowing the present litigation to proceed would likely compound the problem and encourage perpetuation of an ineffective regulatory regime that is confusing and incomplete, that is unduly burdensome for the industry, and that provides neither effective protection nor a suitable remedy for most injured consumers. It is desirable, if possible, to identify and adopt means by which a uniform, national resolution of these issues may be advanced.

## VII.    Denial of Class Certification

Despite the difficulty in prosecuting the proposed instant class action, such a proceeding could be administered with some minimal benefits to the class of phone card users. Meaningful

recovery directly to the individual class members is not possible in view of the small sums involved and the costs of distribution. Relief benefitting the class would require the utilization of, first, cy pres and fluid recovery remedies and, second, injunctive relief.

Appellate courts have generally rejected the analyses of academics and trial courts, frowning on the first of these remedies. *See, e.g.*, Myriam Gilles, *Class Dismissed: Contemporary Judicial Hostility to Small-Claims Consumer Class Actions*, 59 DePaul L. Rev. (forthcoming 2009) (citing cases and other authorities, and criticizing, e.g., the rejection by the Court of Appeals for the Second Circuit of the use of fluid recovery in cigarette litigations (Oct. 2009 draft at 15 & n.50, 19 & n.63 (*available at* http://papers.ssrn.com/sol3/papers.cfm?abstract _id=1499402#))). The second—injunctive relief—would engage the court in inappropriate detailed continuing supervision of the industry.

In light of the context of the case plaintiff cannot satisfy the requirements that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy," Rule 23(b)(3), or that "final injunctive relief or corresponding declaratory relief [be] appropriate respecting the class as a whole," Rule 23(b)(2).

Rule 23(b)(3) permits class certification only where a class action is "*superior* to other available methods" of adjudication. (Emphasis added.) In the present case, the only adequate and appropriate way to protect the rights of the Rule 23(b)(3) class is through regulation and enforcement by a federal administrative agency. The only effective remedy for the harms alleged would be a uniform system of regulation of the prepaid calling card industry based on legislation or public administrative rulemaking, including public hearings, resulting in rules that would cover the entire country and take account of international implications. The court system cannot efficiently carry the burden of protecting this class by a class action such as the present

one. To use the truncated powers of a misshapen 23(b)(3) class action to address the issues raised in plaintiff's complaint would be unfaithful to the premise and reason for the class action—considerations of equity and good judgment.

Whether the court possesses discretion under Rule 23(b)(2) to exercise its judgment of the lack of superiority of a class action over proposed administrative remedies is not clear. Rule 23(b)(2) requires "that final injunctive relief . . . is *appropriate* respecting the class as a whole." (Emphasis added.) It is industry-wide federal regulation, rather than any injunctive or other relief the court could provide, in this limited civil action concerning only some of the many conflicting state laws, which is required effectively to address the conduct complained of by the plaintiff. Reformation of the practices of the industry might justify a class action under Rule 23(b)(2), but this result is best achieved by administrative regulation rather than through repetitive, overlapping civil actions.

Under the special circumstances of the multifarious laws applicable, the class action proposed is not appropriate under either Rule 23(b)(2) or (b)(3). The fact that plaintiff relies on the Class Action Fairness Act, 28 U.S.C. § 1332(d), does not affect the applicability of Rules 23(b)(2) and (b)(3), since the statute affects the jurisdiction—the *power*—of the court to adjudicate, while the Rules tell the court *how* to decide. Certification is denied.

## VIII.  Lack of Jurisdiction

Subject matter jurisdiction in this case is based upon the Class Action Fairness Act, 28 U.S.C. § 1332(d). Am. Compl. ¶ 13. Class certification having been denied, jurisdiction over this action is lacking. The Class Action Fairness Act's diversity requirement is not met, since plaintiff and defendants are all citizens of New York. *See* 28 U.S.C. § 1332(d)(2)(A). As an individual, plaintiff fails to meet the requirement that the class consist of at least 100 members.

34

*See* 28 U.S.C. § 1332(d)(5)(B). Plaintiff's individual claim for the value of the Langosta card—some $2.00—is well below the Class Action Fairness Act's $5 million jurisdictional minimum. 28 U.S.C. § 1332(d)(2).

Amendment of the complaint is not warranted since the $75,000 amount in controversy required for a garden-variety diversity action cannot be established. The remaining parties are all citizens of New York. *See* 28 U.S.C. § 1332(a). There is no basis for federal question jurisdiction over plaintiff's state-law statutory and common law claims. *See* 28 U.S.C. § 1331.

## IX.    Conclusion

The case is dismissed for lack of jurisdiction. No costs or disbursements are awarded.

SO ORDERED.

JACK B. WEINSTEIN
Senior United States District Judge

Dated: November 10, 2009
      Brooklyn, New York

# Appendix 1

# Other Phone Card Cases


COURT'S
EXHIBIT NO. ___1___
IDENTIFICATION/EVIDENCE
DKT.# CV 09-229
DATE: 2/31/09

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, BAIN, GILFILLAN,
 CECCHI, STEWART & OLSTEIN
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORLANDO S. RAMIREZ, individually and on behalf of all others similarly situated, | Docket No. 09-cv-2290(JBW)(MDG) |
| Plaintiff, | |
| v. | |
| DOLLAR PHONE CORP., d/b/a DPC, DOLLAR PHONE SERVICES, INC., DOLLAR PHONE ENTERPRISE, INC., and DOLLAR PHONE ACCESS, INC., | **LIST OF OTHER**<br>**PHONE CARD CASES** |
| Defendants. | |

In accordance with the Court's August 26, 2009 Order, the following are the prepaid telephone calling card cases of which Plaintiff's counsel are aware[1]:

| Caption | Court and Docket No. | Judge | Status |
|---|---|---|---|
| Orlando S. Ramirez v. Dollar Phone Corp., d/b/a DPC, Dollar Phone Services, Inc., Dollar Phone Enterprise, Inc., and Dollar Phone Access, Inc. | EDNY 09-2290(JBW) | Jack B. Weinstein | Motion to dismiss/motion for summary judgment pending, to be argued 8/31/09 |
| In re IDT Calling Card Terms Litigation | DNJ 03-375(SDW) | Susan D. Wigenton | Settlement finally approved 5/15/07 |
| IDT Telecom v. CVT Prepaid Solutions, Dollar Phone Enterprise, Inc., | DNJ 07-1076(PGS) | Peter G. Sheridan | trial set for 10/1/09 |

---

[1] Plaintiff's counsel are not involved in all of these cases, but they are aware that they exist.

| Caption | Court and Docket No. | Judge | Status |
|---|---|---|---|
| Dollar Phone Corp., Dollar Phone Access, Inc., Epana Networks, Inc., STI Phone Card, Inc., Telco Group, Inc. VOIP Enterprises, Inc., Find & Focus Abilities, Inc., Total Cal International, Inc., STI Prepaid, Dollar Phone Services, Inc. | | | |
| Adighibe, Nwaoha, Nkume, Nwankwo, Onokalah, Ibeji, Ogolo, Nkemakolam v. Telco Group, STI Phonecard, VOIP Enterprises, Find and Focus Abilities, STI Prepaid | EDNY 07-1206(ILG) | I. Leo Glasser | dismissed w/o prejudice 4/15/09; claims to be settled as part of *STI* settlement in DNJ |
| Adighibe v. Clifton Telecard Alliance, IDS Telecom d/b/a Cleartel | DNJ 07-1250(PGS) | Peter G. Sheridan | settled as part of DNJ *Monday v. Locus* case |
| Monday and Nkemakolam v. Locus Telecommunications, Inc. | DNJ 07-2659(PGS) | Peter G. Sheridan | settlement finally approved 3/31/09 |
| Monday v Dollar Phone Corp. d/b/a DPC, Dollar Phone Services, Inc., Dollar Phone Enterprise, Inc. and Dollar Phone Access, Inc. | CDCal. 07-4786 AHM (CTx) | A. Howard Matz | individually settled 12/14/07 |
| Osuwah, Onokalah and Ibeji v. SDI Card.com and CVT Prepaid Solutions | DNJ 07-4946(MLC) | Mary L. Cooper | motions to dismiss filed 5/08, awaiting decision |
| Ramirez v. Lycatel | DNJ 07-5533(FSH) | Faith S. Hochberg | settlement and preliminary approval papers being finalized |
| Ramirez v. Friendly Telecom | DNJ 07-5589(FSH) | Faith S. Hochberg | dismissed w/o prejudice 7/18/08 |
| Ramirez v. Roslyn Telco Group | DNJ 07-5590(FSH) | Faith S. Hochberg | dismissed w/o prejudice 1/28/09 |
| Ramirez v. SDICard.com | DNJ 07-5591(FSH) | Faith S. Hochberg | dismissed w/o prejudice 1/24/09 |
| Ramirez and Torres-Hernandez v. CVT Prepaid Solutions | DNJ 08-157(FLW) | Freda L. Wolfson | discovery stayed for 30 days because counsel for CVT advised the Court that it will file for Ch. 7 |

| Caption | Court and Docket No. | Judge | Status |
|---------|----------------------|-------|--------|
| | | | w/i the next 30 days |
| Coppolino and Monday v. Total Call International | DNJ 08-539(FSH) | Faith S. Hochberg | settlement preliminarily approved 7/28/09; final approval hearing 11/10/09 |
| Galvan, Jiminez and Tackwood v. Krossland Communications, Epana Networks, Kangs Distribution and Allcom Telink Corp. | C.D.Cal. 08-999-JVS | James V. Selna | claims vis-a-vis distributors of Locus cards settled as part of DNJ *Monday v. Locus* case; claims against Epana filed separately and being settled as part of DNJ *Epana* case; case proceeding against Allcom |
| FTC v. Clifton Telecard Alliance One and Mustafa Qattous | DNJ 08-1480(PGS) | Peter G. Sheridan | agreed permanent injunction and money judgment entered 6/22/09 |
| Ramirez and Torres-Hernandez v. STI Prepaid L.L.C., STI Phonecard, Inc., Telco Group, Inc., VOIP Enterprises, Inc. | DNJ 08-1089 (SDW) | Susan D. Wigenton | settlement papers being drafted |
| FTC v. Alternatel, Inc., G.F.C. Enterprises LLC also d/b/a Mystic Prepaid, Voice Prepaid, Inc., Telecom Express, Inc., Voice Distributors, Inc., Lucas Friedlander, Moses Greenfield[2], Nikolas Gulakos, and Frank Wendorff | SDFla. 08-21433 | Adalberto Jordan | agreed permanent injunction and money judgment entered 4/1/09 |
| Monday v. Telmex USA LLC | DNJ 08-4038(DMC) | Dennis M. Cavanaugh | dismissed w/o prejudice 5/29/09 |
| Ramirez and Bukzom v. Epana Networks, Inc. | DNJ 08-4040(PGS) | Peter G. Sheridan | settlement and preliminary approval papers being drafted |
| Ramirez v. iBasis | EDNY | Kiyo A. Matsumoto | motion for attorney's |

---

[2]      Plaintiff believes that Mr. Greenfield is a principal of Dollar. According to the FTC complaint, Mr. Greenfield is an owner of Alternatel and Mystic Prepaid.

| Caption | Court and Docket No. | Judge | Status |
|---|---|---|---|
| | 08-5125(KAM) | | fees pursuant to R. 41(d) pending, argued 8/11/09 |
| Spira v. CVT Prepaid Solutions, Dollar Phone Corp., Dollar Phone Services, Dollar Phone Enterprises, Dollar Phone Access, Epana Networks, Locus Telecommunications, Total Call International, STI Phonecard, STI Prepaid, Find & Focus Abilities, VOIP Enterprises, Telco Group | SDNY 08-1998(RJS) | Richard J. Sullivan | dismissed w/o prejudice 3/25/08 |
| Elsa Jimenez v. Kang's Distribution, Inc. and Epana Networks, Inc. | CDCal. 09-2107-JVS | James V. Selna | being settled as part of DNJ *Epana* case |
| State of New Jersey, Division of Consumer Affairs v. CVT Prepaid Solutions, Dollar Phone Enterprises, Epana Networks, IDT Corp., Locus Telecommunications, STi PhoneCard, Total Call International | administrative complaint | | settlement agreement to comply with NJ law, reimburse state for costs of investigation and pay for monitoring for 3 years, announced 3/17/09 |
| Jiminez v. CVT Prepaid Solutions | NDIll 09-1558 | John W. Darrah | answer filed 7/14/09 |
| FTC v. Diamond Phone Card, Nasreen Giliani, and Samsuddin Panjawani | EDNY 09-3257(NGG) | Nicholas G. Garaufis | answer due 9/3/09 |

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART AND OLSTEIN
Attorneys for Plaintiff


By: _____/s/ Lindsey H. Taylor_____
      LINDSEY H. TAYLOR


Dated: August 31, 2009

Appendix 2

United States Department of Justice,

Report of Administrative Actions to Control Phone Cards,

Oct. 20, 2009





**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★  OCT 2 6 2009  ★

BROOKLYN OFFICE

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 20, 2009

Honorable Jack B. Weinstein
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:   Ramirez v. Dollar Phone Corp. et al.
          Civil Action No. CV-09-02290 (JBW/MDG)

Dear Judge Weinstein:

     The United States of America respectfully submits this letter in response to Your
Honor's August 31, 2009 request that the United States detail the measures in place and
actions taken by the federal government to address deceptive and fraudulent practices in the
prepaid calling card industry.[1]  As described in detail below, this issue is being actively
addressed on a number of fronts.[2]

     The prepaid calling card industry is composed of two major actors:  (1) entities that
sell cards on a wholesale basis (distributors); and (2) common carriers that provide the
underlying telecommunications service for the cards (common carriers).  Distributors fall
within the purview of the Federal Trade Commission (FTC), and the Federal
Communications Commission (FCC) regulates conduct by interstate common carriers
engaged in providing telecommunications service.[3]

---

1 The United States notes that, while it willingly provides this letter to the Court, neither the
United States nor any of its agencies or officials are parties to this action, and that, by
submitting this letter, neither the United States nor any of its agencies or officials submit to
the Court's jurisdiction with respect to the issues raised in this action.

2 The information in this submission has been provided to this Office by FTC and FCC staff.

3 The FTC Act exempts common carriers subject to the Communications Act from its
prohibitions on unfair or deceptive acts or practices.  15 U.S.C. §§ 45(a)(2) & 44.



The FTC vigorously prosecutes distributors of prepaid phone cards who engage in deceptive or unfair marketing practices. Similarly, the FCC has authority to take enforcement action against common carriers if their practices in connection with prepaid phone cards are unreasonable or otherwise violate FCC rules or the Communications Act.[4] In addition, the FCC applies its expertise with respect to common carriers to assist the FTC in its enforcement efforts.

The FTC also has convened a joint federal-state task force focused on deceptive marketing practices in the prepaid calling card industry. Through this task force, the FTC, the FCC, and the representatives of the offices of over 35 state attorneys general work to coordinate and strengthen their law enforcement efforts. Finally, as the Court is aware, federal legislation has been proposed to address the federal government's ability to regulate and combat fraud in the prepaid calling card industry.

## I.    The Federal Trade Commission

The FTC has been at the forefront of the federal government's efforts to protect consumers from deceptive practices in the prepaid calling card business. The FTC has taken a four-pronged approach to combat this issue: (1) the investigation and prosecution of individuals and entities within its jurisdiction for deceptive marketing of prepaid calling cards; (2) the formation of a joint federal-state task force to combat fraud in the prepaid calling card industry; (3) public outreach and education to assist consumers of prepaid calling cards; and (4) support for federal legislation to strengthen its ability to fight fraud in this area.

### A.    FTC Enforcement Actions

The heart of the FTC's law enforcement authority is Section 5 of the FTC Act, 15 U.S.C. § 45(a)(2), which prohibits deceptive or unfair acts or practices in or affecting commerce. The FTC has independent litigating authority to initiate federal district court proceedings to enjoin violations of the FTC Act and to obtain other equitable relief, such as restitution and disgorgement of ill-gotten gains. 15 U.S.C. § 53(b).

Since the late 1990's, the FTC has exercised this authority to bring federal court actions against a number of calling card distributors. In the first two such cases, the FTC

---

4 Section 201(b) of the Communications Act mandates that "[a]ll charges, practices, classifications, and regulations for and in connection with. . . communications service, shall be just and reasonable." 47 U.S.C. § 201(b). The FCC has found that unfair and deceptive marketing practices by common carriers "constitute unjust and unreasonable practices under section 201(b)." In the Matter of Joint FCC/FTC Policy Statement For the Advertising of Dial-Around And Other Long-Distance Services to Consumers, FCC 00-72 (2000), citing Business Discount Plan, Inc., 14 FCC Rcd 340, 355-58 (1998); AT&T Corp., 71 RR2d 775 (1992). Thus, the FCC has statutory authority over common carriers that provide prepaid calling card interstate telecommunications services and engage in deceptive practices.

charged the defendants with, among other things, misrepresenting the per-minute rates consumers would be charged because the advertised per-minute rates did not incorporate connection and maintenance fees. FTC v. PT-1 Commns., Inc., 99-CIV-1432 (S.D.N.Y.) (Stipulated Final Order entered Mar. 23, 1999); FTC v. Trans-Asian Commns., Inc., 97-CIV-5764 (S.D.N.Y.) (Stipulated Final Order entered Mar. 25, 1998). In both cases, the FTC succeeded in obtaining judicial orders that, inter alia, barred the defendants from making future misrepresentations about prepaid calling cards.

The FTC has recently brought three cases against major distributors of prepaid calling cards. As the Court noted in its Preliminary and Provisional Draft Memorandum and Order in the above-referenced case, in March 2008, the FTC filed an action against Clifton Telecard Alliance ("CTA"), a nationwide distributor of calling cards based in New Jersey, and a principal of the company. FTC v. Clifton Telecard Alliance One LLC, 2:08-CV-01480-PGS-ES (D.N.J.) (Stip. Final Order and Judgment entered June 22, 2009). The FTC alleged that the defendants, which marketed cards chiefly to recent immigrants, violated the FTC Act by: (1) misrepresenting the number of calling minutes provided by their cards; (2) failing to disclose, or disclose adequately, fees and charges associated with their cards; and (3) failing to disclose that consumers could be charged even for unconnected calls. In testing by the FTC, the defendants' cards delivered only approximately half the advertised talk time.

In June of 2009, the FTC obtained a stipulated final order imposing a $1.3 million judgment against the CTA defendants. The final order also bars the defendants from misrepresenting the number of minutes of talk time a consumer will receive using its cards and requires the defendants to clearly and conspicuously disclose any fees and charges and other material terms and conditions. Moreover, the final order imposes extensive obligations on the defendants to monitor their business partners — including the telecommunications service providers — to help ensure that consumers actually receive the advertised number of calling minutes. For example, the defendants must routinely test the cards they distribute to ensure that they are delivering the minutes promised to consumers.

In May 2008, the FTC filed a similar case against a group of distributors of prepaid calling cards and the companies' principals, which marketed prepaid calling cards to recent immigrants in Florida, Massachusetts, New Hampshire, and New Jersey. FTC v. Alternatel, Inc., 08-21433-CIV-Jordan/McAliley (S.D. Fla.) (Stip. Final Order and Judgment entered Apr. 1, 2009). As in CTA, in testing by the FTC, the defendants' calling cards delivered only about half the advertised calling minutes.

On April 1, 2009, the court entered a stipulated final order requiring the defendants to pay a $2.25 million judgment, permanently barring them from misrepresenting the number of minutes consumers of the cards will receive, and mandating clear and conspicuous disclosure of all fees and charges and other material terms and conditions. The order also imposes extensive monitoring, reporting, and testing requirements on the defendants similar to those imposed in CTA.

Most recently, the FTC sued Diamond Phone Card, Inc., a distributor of prepaid calling cards, and its principals. FTC v. Diamond Phone Card, Inc., 09-CV-3257 (E.D.N.Y.) (Garaufis, J.) (Compl. filed July 29, 2009). In that action, the FTC alleges that Diamond Phone Card, an Elmhurst, NY-based company that marketed and sold cards in New York, New Jersey, and Texas, among other states, violated the FTC Act by misrepresenting the number of calling minutes consumers could obtain using Diamond prepaid calling cards and by failing to adequately disclose fees associated with Diamond phone cards. The FTC seeks a permanent injunction as well as equitable monetary relief in the form of restitution and/or disgorgement of ill-gotten gains.

In its October 1, 2009 Preliminary and Provisional Draft Memorandum and Order, the Court stated that "it is notable . . . that the FTC has directed its enforcement actions in this area against calling card distributors, rather than service providers like Dollar." 2009 WL 3171738 * 8 (E.D.N.Y. Oct. 1, 2009). However, the FTC's enforcement actions have focused on the distributors because of the common carrier exemption to the FTC Act (see *supra*, footnote 3). Accordingly, that the FTC has not sued any prepaid calling card common carriers does not reflect any determination by the FTC or the Courts that common carriers are not engaged in fraudulent practices.

## B. FTC Joint Federal-State Task Force

To strengthen its enforcement efforts, in fall of 2007, the FTC established a joint federal-state task force focused on fraudulent marketing practices in the prepaid calling industry to coordinate law enforcement activities. Through this task force, the FTC has worked with representatives of the offices of more than 35 state attorneys general, the FCC, and representatives of several state and local consumer protection agencies. Florida, New Jersey, California, and Texas, have collectively brought 22 law enforcement actions in this area.[5]

---

5 The Florida Attorney General has entered into assurances of voluntary compliance (AVC) with thirteen prepaid calling card companies. See Press Release, "McCollum Announces Prepaid Calling Card Settlements, Industry-Wide Reform" (June 11, 2008), available at http://myfloridalegal.com/newsrel.nsf/newsreleases/79C6666DB24608D785257465004EC90 1; Press Release, "Prepaid Calling Company Reaches Settlement with Attorney General (July 2, 2008), available at http://myfloridalegal.com/newsrel.nsf/newsreleases/1439BD5308D470588525747A006423B 8; Press Release, "Attorney General Reaches Settlement with 11th Prepaid Calling Card Company" (Aug. 21, 2008), available at http://myfloridalegal.com/newsrel.nsf/newsreleases/C410C546EB409C93852574AC006C94 99; Press Release, "Hispanic Institute to Receive $105,000 Under Prepaid Calling Card Settlement" (Dec. 30, 2008), available at http://www.myfloridalegal.com/newsrel.nsf/newsreleases/B905AEBA24E6551C8525752F0 05BFA2. The New Jersey Attorney General has entered into AVCs with seven prepaid calling card companies. See Press Release, "New Jersey Calls 'Time Out' on Prepaid Calling Cards," (Mar. 17, 2009), available at

### C. FTC Consumer Education and Media Outreach

In addition to bringing enforcement cases, the FTC has made consumer education and outreach in this area a high priority. The FTC has produced a consumer education brochure on calling cards, which is available in both English and Spanish on the FTC's website. See Buying Time: The Facts About Pre-Paid Phone Cards (2008) available at http://www.ftc.gov/bcp/edu/pubs/consumer/products/pro04.pdf. A copy of the brochure is attached to this letter as Attachment A. The FTC also has done extensive outreach about prepaid calling cards to media outlets that cater to non-English and English speaking consumers. A key purpose of these efforts is to encourage consumers to complain to the FTC (or their state attorney general) if they do not get what they pay for from a calling card, to alert them to the shady practices of some prepaid calling card companies, and to arm them with information that may help them to avoid such companies in making their purchasing decisions.

## II.    The Federal Communications Commission

The FCC has exclusive federal jurisdiction over interstate common carriers subject to the Communications Act of 1934, as amended, 47 U.S.C. § 151 et seq., and thus has the authority to regulate, and take enforcement action against, common carriers that engage in deceptive marketing practices in conjunction with providing interstate telecommunications services for prepaid calling cards.[6]  The Communications Act subjects common carriers to close FCC scrutiny over almost every aspect of a common carrier's business practices.

With respect to prepaid calling card issues, the FCC strongly encourages consumers to file complaints concerning problems with prepaid calling cards and assists individual consumers with the resolution of those problems to the extent that the complaint involves the actions of a common carrier. In addition to processing individual complaints, the FCC analyzes all consumer complaints to identify possible investigative targets in the most problematic substantive complaint areas – including prepaid calling card issues – to enable more aggressive enforcement action against these targets. Using the considerable authority that the FCC exercises over the entities it regulates, the FCC may issue administrative sanctions (including forfeitures of up to $130,000 per violation) without the need to resort to court action, can revoke the common carrier operating authority of egregious or repeat

---

http://www.consumeraffairs.com/news04/2009/03/nj_calling_cards.html. The California Attorney General has obtained a consent order against a prepaid calling card carrier. See Press Release, "Brown Prevents Calling Card Company From Boosting Profits By Charging Hidden Fees," available at http://ag.ca.gov/newsalerts/release.php?id=1732. The Texas Attorney General has an ongoing court action against a prepaid calling card carrier. See Press Release, "Attorney General Abbott Takes Action Against Prepaid Calling Card Company," (May 23, 2008), available at http://www.oag.state.tx.us/oagNews/release.php?id=2479.

6 State consumer protection laws may also permit some state enforcement action to protect citizens against fraud.

offenders, and through the resolution of investigations by settlement, require providers to adopt prophylactic measures to prevent future violations (*e.g.*, compliance plans, employee training, and reporting requirements). Additionally, the FCC engages in significant consumer education efforts in order to inform consumers of deceptive practices in the prepaid calling card industry and how they can file consumer complaints should they fall victim to such practices, including distribution of a consumer information brochuer (see Exhibit B hereto). Finally, the FCC collaborates with the FTC and uses its expertise in common carrier regulations to assist the FTC in targeting its enforcement efforts against non-common carriers, prepaid calling card providers and distributors who engage in deceptive marketing practices.

**The FCC's Enforcement Mechanisms**

The FCC has multiple methods for addressing violations of the Communications Act, including imposing a range of penalties after conducting independent investigations, ruling on formal complaints, and facilitating the resolution of informal complaints by consumers.

*Agency Initiated Investigations:* The FCC can investigate, on its own motion, alleged violations of the Communications Act or its rules and orders. Specifically, Section 503 of the Communications Act allows the FCC to rapidly and efficiently issue administrative sanctions against the entities it regulates, giving the FCC authority to impose monetary forfeitures on common carriers of up to $130,000 per violation if they violate the Communications Act by engaging in deceptive or fraudulent practices. The FCC can do so without the necessity of initiating a judicial proceeding. In the case of repeat or egregious violators, the FCC also has the authority to revoke a common carrier's operating authority after a hearing if the company's violations call into question its qualifications to be certified as a provider of telecommunications services. See 47 U.S.C. §§ 214, 312(b).

*Informal and Formal Consumer Complaints:* Significantly, the Commission's informal complaint process permits consumers to obtain immediate redress for the problems that they encounter with a common carrier's unjust or unreasonable practice in the provision of a prepaid calling card. Pursuant to 47 C.F.R. § 1.716, consumers can file informal complaints against a common carrier with the FCC. Complaints can be filed online at http://esupport.fcc.gov/complaints.htm or via mail, phone, fax, or email. The FCC serves all informal consumer complaints on the common carrier to which the complaint is targeted. Id. at 1.717. The common carrier that is the subject of the complaint must then respond to both the complainant and the FCC.

Consumers also may file a formal complaint alleging a violation of the Communications Act or an FCC rule or policy. See 47 U.S.C. § 208; 47 C.F.R. § 1.720-1.736. This triggers an adjudicatory proceeding that serves as an alternative to federal district court litigation. See 47 U.S.C. § 207. The FCC can award damages sustained as a consequence of violations proven by the complainant in such proceedings. See 47 U.S.C. §§ 206-207; 47 C.F.R. § 1.722.

### III. Legislative Action

As the Court has noted in its preliminary decision issued on October 1, 2009, attempts have been made in Congress to pass legislation mandating clear and conspicuous disclosures by prepaid calling card distributors and service providers. In September 2008, the proposed "Calling Card Consumer Protection Act," H.R. 3402, 110th Cong. (2007) (hereinafter the "2008 House Bill"), passed the House of Representatives. Although this legislation was not enacted into law prior to the end of the 110th Congress. A similar bill, which would enact the proposed "Prepaid Calling Card Consumer Protection Act of 2009", S. 562, 111th Cong. (2009) (hereinafter the "Senate Bill"), is currently pending before the Senate.

The 2008 House Bill would have required both prepaid calling card distributors and the common carriers that provide the underlying telecommunications services for prepaid calling cards to clearly and conspicuously disclose information about: (1) the provider's name, customer service number, and hours of service; (2) the card's number of minutes or dollar value; (3) per minute rates or a toll-free number to obtain rates; (4) fees and charges; (5) any predetermined decrease in value over a period of time or expiration dates; and (6) refund and recharge policies.

Additionally, the 2008 House Bill would have given the FTC jurisdiction over common carriers in the prepaid calling card industry, to issue rules under the Administrative Procedures Act, 5 U.S.C. § 553, and to seek civil penalties for violation of the Act and its regulations. The 2008 House Bill would also have authorized the States to enforce the Act and the FTC regulations issued thereunder. A copy of the 2008 House Bill, as approved by the House, is attached to this letter as Attachment C.

The Senate Bill, co-sponsored by Senators Amy Klobuchar (D-MN) and Olympia Snowe (R-ME) has been referred to the Senate Committee on Commerce, Science, and Transportation and is still awaiting consideration by that Committee. A copy of the Senate Bill, is attached to this letter as Attachment D.

The Senate Bill would require the FTC to issue regulations pursuant to the APA requiring prepaid calling card providers and distributors to make "clear and conspicuous" disclosures of: (1) the number of calling units or minutes of domestic interstate calls provided or the dollar value and the domestic interstate rate per minute; (2) the calling unit or per minute rates for each served international preferred destination; (3) the applicable per minute rates for each served international destination; (4) other material terms and conditions, including fees, policies on refunds, recharges, decrements, and expiration, and time limitations; and (5) a toll-free customer service number and hours. These disclosures would have to be located on the card or on its packaging, so as to be visible at the point of sale; they would also have to appear on advertising, promotional materials, and Internet sites used to sell or promote the cards.

8

The Senate Bill would also make it unlawful for prepaid calling service providers to (1) deduct anything but the per minute rate and disclosed fees; (2) provide fewer minutes or charge a higher per minute rate than promoted or advertised; (3) provide fewer minutes than the number of minutes announced, promoted, or advertised through any voice prompt; (4) have an expiration date less than one year after first use (or after additional minutes are purchased); (5) charge a fee for an unconnected call; and (6) deduct a per-minute rate in an increment greater than one minute for calls that are less than one full minute.

The Senate Bill would give the FTC a federal right of action against violators of the Act and the FTC regulations promulgated pursuant to it. Violations of the Act or the implementing regulations would be treated as a violation of an FTC rule, and thus would subject the violator to civil penalties. The proposed law would also create a carve out from the common carrier exemption, whereby the FTC would have the authority to prosecute both distributors and common carriers for violations of the Act.

In September 2008, the FTC testified twice in favor of the legislation discussed above, which would give it broader authority in combating fraud in the prepaid calling card industry.[7] The FTC has supported this legislation because, among other things, the legislation would change current law and give it authority over common carriers in this industry, authorize it to issue civil penalties and give it APA rulemaking authority on this subject. The FCC maintains broad jurisdiction over common carriers, including rulemaking and forfeiture authority, and actively pursues wrongdoing pursuant to 47 U.S.C. §§ 201 and 208. The FCC has not taken a position on the proposed legislation.

In sum, the United States is deeply concerned about deceptive practices in the prepaid calling card industry, and is actively addressing this issue through enforcement, coordination with the states, and consumer education.

Very truly yours,

BENTON J. CAMPBELL
United States Attorney

By:

MICHAEL J. GOLDBERGER
Assistant U.S. Attorney
(718) 254-6052

cc: Attorneys for the Parties (by mail)

---

7 See Prepared Statement of the Federal Trade Commission, Before the Subcommittee on Commerce, Trade and Consumer Protection, Committee on Energy and Commerce, United States House of Representatives (Sept. 16, 2008), available at www.ftc.gov/os/2008/09/P074406prepaidcc.pdf

# ATTACHMENT A

# FTC FACTS for Consumers

# Buying Time:
## The Facts About Pre-Paid Phone Cards

**P**re-paid phone cards represent telephone calling time you buy in advance. You pay from $2 to $20 or so to buy local or long-distance calling time; the amount of time you buy depends on the rate-per-minute charged. For many people, pre-paid phone cards are very convenient. You've paid for the phone time and you can use the card from any phone to make your calls.

But the Federal Trade Commission (FTC), the nation's consumer protection agency, says that some pre-paid phone cards can have hidden costs. As a result, they don't deliver the number of calling minutes they advertise. Because you pay in advance, you may be out of pocket — and out of luck — if you discover a problem trying to use the card. That's a big difference between pre-paid phone cards and traditional long distance calling cards, where charges don't appear on your bill until after you've made the call.

You can buy pre-paid phone cards at newsstands, grocery and convenience stores, travel agencies, retail stores, and on the Internet. People who regularly call overseas use them, as do travelers, students, and those who may not have long-distance telephone service. You can add minutes to many pre-paid phone cards, usually by charging the additional cost to your credit card.

## How Pre-Paid Phone Cards Work

Most pre-paid phone cards display a local or toll-free access telephone number and a personal identification number (PIN). The companies that issue the cards have computers that use your PIN to keep track of your card usage — how much time you have on your card in minutes or units. To make a phone call, you dial the access number, enter your PIN, and at the voice prompt, enter the phone number you want to reach. A computer tells you how much time — or how many units — you have left on your card, and how to use other features your card may offer. If your pre-paid phone card can't be recharged — that is, if you can't use the telephone to buy additional minutes for the card — you'll need to buy another card once you've used up the time or units on your card.

When you buy a pre-paid phone card from a store, it's important to remember that the store doesn't control the quality of the service. To make sure you're getting what you pay for, try buying a card for a small denomination first to test out the service.

## Consumer Concerns

There's no question that prepaid phone cards offer convenience. But sometimes, the cards don't work as promised. Some people who have bought and used these cards have registered complaints about:

- cards that don't deliver the number of calling minutes they advertise

# Facts for Consumers

- cards that debit minutes or units even when you don't connect with the number you're calling
- hidden connection charges, taxes, and surcharges that increase the rate-per-minute
- bad connections
- access numbers or PINs that don't work
- customer service numbers that are busy or simply don't work
- toll-free access numbers that are constantly busy, preventing you from using the card
- issuers who go out of business and leave cardholders with a useless card

## Buying Time and Value

You can avoid many of these problems — and buy considerable peace of mind — by planning. Although many people buy pre-paid phone cards on-the-spot, you can avoid disappointment by doing some advance work:

- Ask any retailer if they will stand behind the card if it doesn't deliver the number of minutes advertised.
- Check the card's package or in-store advertising for domestic and international rates. If you can't find the rate, consider buying a different card.
- Look for disclosures about surcharges, "maintenance" fees, and fees for making calls from a pay phone, to a cell phone, or using a toll-free access number.
- Compare rates. Very low rates, particularly for international calls, may be a warning sign that the card won't deliver the number of advertised minutes.
- Look for expiration dates.
- Look for a toll-free customer service number. If the customer service number isn't toll-free or displayed, it may be difficult to contact the company if you have a problem with the card.

- Make sure you can understand the instructions on the card.
- Make sure the card comes in a sealed envelope or that the PIN is not visible. Otherwise, anyone can copy the PIN and use the phone time you're paying for.

## Selling Cards

If you want to distribute pre-paid phone cards or sell them in your store, the same considerations apply. Ask the distributor for references of the company providing the phone time. Very, very low rates may be a sign that the card won't deliver the number of minutes it promises to. Consumers who buy cards that don't deliver the advertised minutes are more likely to return to your store expecting a refund.

## For More Information

If your pre-paid phone card doesn't work — even after you've called the customer service number — contact:

- The Federal Trade Commission (ftc.gov or 1-877-FTC-HELP)
- Your local Consumer Affairs Department or state Attorney General
- Your local Better Business Bureau to file a complaint or get a report based on customer experience.

The FTC works for the consumer to prevent fraudulent, deceptive, and unfair business practices in the marketplace and to provide information to help consumers spot, stop, and avoid them. To file a complaint or to get free information on consumer issues, visit ftc.gov or call toll-free, 1-877-FTC-HELP (1-877-382-4357); TTY: 1-866-653-4261. The FTC enters Internet, telemarketing, identity theft, and other fraud-related complaints into Consumer Sentinel, a secure online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

# ATTACHMENT B



FCC Home | Search | RSS | Updates | E-Filing | Initiatives | Consumers |
Find People

## Consumer & Governmental Affairs Bureau

FCC > CGB Home > Consumer Publications > Pre-Paid Phone Cards: What Consumers Should Know        FCC site map

| Pre-Paid Phone Cards: What Consumers Should Know | FCC Consumer Facts |
|---|---|

### Background

A pre-paid phone card is a card you purchase to make long distance phone calls. Many people use a pre-paid phone card because of the card's convenience - it can be used anywhere and, because you pay in advance, there is no bill. Pre-paid phone cards are popular among travelers, students, people who frequently call overseas, and those who haven't selected a preferred long distance telephone company. The cards are sold in stores everywhere.

### International Calls

Rates for international calls using pre-paid phone cards can vary dramatically, based on the country that you call or the way that you make the call. Pre-paid phone cards may offer rates that are much lower than a telephone company's basic international rates.

### How Do I Use a Pre-Paid Phone Card?

A toll-free access phone number and a personal identification number (PIN) are usually printed on each phone card. To make a phone call, you dial the access number and then enter the PIN.

An automated voice will ask you to enter the phone number you are calling, and tell you how much time you have left on your card. It might also give you other information or options.

### Tracking Time

Phone card companies keep track of how much of a card's calling time is used by the card's PIN number. You can add time to some pre-paid phone cards, and the added cost can usually be billed to a credit card. Other cards are designed to be discarded once you have used all the time. Also, pre-paid phone cards often have expiration dates. Make sure to keep track of the date on which your card expires so you don't lose unused minutes.

### Who Makes Your Pre-Paid Phone Card Work?

- **Telephone Companies** are responsible for the telephone lines that carry calls;

- **Resellers** buy telephone minutes from the telephone companies;

- **Issuers** set the card rates and provide toll-free customer service and access numbers;

- **Distributors** sell the cards to the retailers; and

- **Retailers** sell the cards to consumers, but may have no control over the quality of service.

## Common Complaints Associated with Pre-Paid Phone Cards

As pre-paid phone cards are increasing in popularity, some common complaints are:

- access numbers and/or PINs that don't work;

- service or access numbers that are always busy;

- card issuers that go out of business, leaving people with useless cards;

- rates that are higher than advertised, or contain undisclosed fees;

- cards that charge you even when your call does not go through;

- poor quality connections;

- cards that expire without the purchaser's knowledge; and

- per-call fees deducted from the time.

## How Can I Avoid Any Problems?

Make sure you understand the rates in effect for your particular phone card. Also check the expiration date, look for a toll-free customer service number provided with or on the card, and make sure you understand the instructions on how to use the card. You may also want to ask your friends and family to recommend cards they have used and liked.

## What Should I Do if I Have a Problem with a Pre-Paid Phone Card?

First, try contacting the card issuer, who is usually listed on the back of the card (or who can be determined by calling the customer service number listed on the card). If that doesn't work, you can file a complaint with the FCC. You can file your complaint using an FCC on-line form found at esupport.fcc.gov/complaints.htm. You can also file your complaint with the FCC's Consumer Center by e-mailing fccinfo@fcc.gov; calling 1-888-CALL-FCC (1-888-225-5322) voice or 1-888-TELL-FCC (1-888-835-5322) TTY; faxing 1-866-418-0232; or writing to:

Federal Communications Commission
Consumer & Governmental Affairs Bureau

Consumer Inquiries and Complaints Division
445 12th Street, SW
Washington, D.C. 20554.

**What to Include in Your Complaint**

The best way to provide all the information the FCC needs to process your complaint is to complete fully the on-line complaint form. When you open the on-line complaint form, you will be asked a series of questions that will take you to the particular section of the form you need to complete. If you do not use the on-line complaint form, your complaint, at a minimum, should indicate:

- your name, address, e-mail address, and phone number where you can be reached;

- the names and phone numbers of any companies involved with your complaint (it's a good idea to provide ALL of the information obtained on the calling card at issue, including any associated information that came with the card);

- the amount of any disputed charges, whether you paid them, whether you received a refund or adjustment to your bill, the amount of any adjustment or refund you have received, an explanation if the disputed charges are related to services in addition to residence or business telephone services; and

- the details of your complaint and any additional relevant information.

**Other Problems**

If you are having a problem with the local retailer (such as a discount store, local market, etc.) from which you purchased the card, try calling or writing your local Consumer Affairs or Better Business Bureau or state Attorney General. These phone numbers are often found in the blue pages or government section of your local telephone directory.

In some cases, pre-paid phone cards are marketed by companies other than the telephone company or service provider. If you have concerns about deceptive or false advertising or marketing practices by these entities, you can seek additional assistance from the Federal Trade Commission by visiting: www.ftc.gov/bcp/consumer.shtm. You can also submit a complaint to the FTC on-line at: https://www.ftccomplaintassistant.gov/; by calling toll-free to 1-877-382-4357 (voice) or 1-866-653-4261 (TTY); or writing to:

Federal Trade Commission
CRC-240
600 Pennsylvania Ave., NW
Washington, DC 20580.

---

**For More Information**

For information about other communications issues, visit the FCC's Consumer & Governmental Affairs Bureau Web site at www.fcc.gov/cgb, or contact the FCC's Consumer Center using the information provided for filing a complaint.

---

For this or any other consumer publication in an accessible format
(electronic ASCII text, Braille, large print, or audio) please write or
call us at the address or phone number below, or send an e-mail to FCC504@fcc.gov.

To receive information on this and other FCC consumer topics through
the Commission's electronic subscriber service, visit
www.fcc.gov/cgb/contacts/.

This document is for consumer education purposes only and is not intended to
affect any proceeding or cases involving this subject matter or related issues.

11/6/08

 Federal Communications Commission · Consumer & Governmental Affairs Bureau · 445 12th St. S.W. · Washington, DC 20554
1-888-CALL-FCC (1-888-225-5322) · TTY: 1-888-TELL-FCC (1-888-835-5322) · Fax: 1-866-418-0232 · www.fcc.gov/cgb/

*last reviewed/updated on 11/07/08*

---

FCC Home  |  Search  |  RSS  |  Updates  |  E-Filing  |  Initiatives  |  Consumers  |  Find People

Federal Communications Commission     Phone: 1-888-CALL-FCC
445 12th Street SW                                       (1-888-225-5322)
Washington, DC 20554                          TTY: 1-888-TELL-FCC
More FCC Contact Information...                  (1-888-835-5322)
                                                            Fax: 1-866-418-0232
                                                        E-mail: fccinfo@fcc.gov

- Privacy Policy
- Website Policies & Notices
- Required Browser Plug-ins
- Freedom of Information Act

# ATTACHMENT C

IIB

110TH CONGRESS
2D SESSION

# H. R. 3402

## IN THE SENATE OF THE UNITED STATES

SEPTEMBER 26 (legislative day, SEPTEMBER 17), 2008
Received

OCTOBER 2 (legislative day, SEPTEMBER 17), 2008
Read twice and referred to the Committee on Commerce, Science, and
Transportation

# AN ACT

To require accurate and reasonable disclosure of the terms
and conditions of prepaid telephone calling cards and
services.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

2

1  **SECTION 1. SHORT TITLE.**

2      This Act may be cited as the "Calling Card Consumer

3  Protection Act".

4  **SEC. 2. DEFINITIONS.**

5      For purposes of this Act, the following definitions

6  apply:

7          (1) The term "Commission" means the Federal

8      Trade Commission.

9          (2) The term "prepaid calling card" has the

10     meaning given the term "prepaid calling card" by

11     section 64.5000(a) of the Federal Communications

12     Commission's regulations (47 C.F.R. 64.5000(a)).

13     Such term shall also include calling cards that use

14     VoIP service or a successor protocol. Such term

15     shall also include an electronic or other mechanism

16     that allows users to pay in advance for a specified

17     amount of calling. Such term shall not include—

18         (A) calling cards or other rights of use

19         that are provided for free or at no additional

20         cost as a promotional item accompanying a

21         product or service purchased by a consumer;

22         (B) any card, device, or other right of use,

23         the purchase of which establishes a customer-

24         carrier relationship with a provider of wireless

25         telecommunications service or wireless hybrid

26         service, or that provides access to a wireless

**HR 3402 RFS**

3

| | |
|---|---|
| 1 | telecommunications service or wireless hybrid |
| 2 | service account wherein the purchaser has a |
| 3 | pre-existing relationship with the wireless serv- |
| 4 | ice provider; or |
| 5 | (C) payphone service, as that term is de- |
| 6 | fined in section 276(d) of the Communications |
| 7 | Act of 1934 (47 U.S.C. 276(d)). |
| 8 | (3) The term "prepaid calling card provider" |
| 9 | has the meaning given the term "prepaid calling |
| 10 | card provider" by section 64.5000(b) of the Federal |
| 11 | Communications Commission's regulations (47 |
| 12 | C.F.R. 64.5000(b)). Such term shall also include— |
| 13 | (A) a provider of a prepaid calling card |
| 14 | that uses VoIP service or a successor protocol; |
| 15 | and |
| 16 | (B) a provider of a prepaid calling card |
| 17 | that allows users to pay in advance for a speci- |
| 18 | fied amount of minutes through an electronic or |
| 19 | other mechanism. |
| 20 | (4) The term "prepaid calling card distributor" |
| 21 | means any entity or person that purchases prepaid |
| 22 | calling cards from a prepaid calling card provider or |
| 23 | another prepaid calling card distributor and sells, re- |
| 24 | sells, issues, or distributes such cards to one or more |

4

1    distributors of such cards or to one or more retail

2    sellers of such cards.

3    (5) The term "wireless hybrid service" is de-

4    fined as a service that integrates both commercial

5    mobile radio service (as defined by section 20.3 of

6    the Federal Communications Commission's regula-

7    tions (47 C.F.R. 20.3)) and VoIP service.

8    (6) The term "VoIP service" has the meaning

9    given the term "interconnected Voice over Internet

10    protocol service" by section 9.3 of the Federal Com-

11    munications Commission's regulations (47 C.F.R.

12    9.3). Such term shall include any voice calling serv-

13    ice that utilizes a voice over Internet protocol or any

14    successor protocol in the transmission of the call.

15    (7) The term "fees" includes all charges, fees,

16    taxes, or surcharges applicable to a prepaid calling

17    card that are—

18    (A) required by Federal law or regulation

19    or order of the Federal Communications Com-

20    mission or by the laws and regulations of any

21    State or political subdivision of a State; or

22    (B) expressly permitted to be assessed

23    under Federal law or regulation or order of the

24    Federal Communications Commission or under

5

1        the laws and regulations of any State or polit-

2        ical subdivision of a State.

3        (8) The term "additional charge" means any

4    charge assessed by a prepaid calling card provider or

5    prepaid calling card distributor for the use of a pre-

6    paid calling card, other than a fee or rate.

7        (9) The term "international preferred destina-

8    tion" means one or more specific international des-

9    tinations named on a prepaid calling card or on the

10    packaging material accompanying a prepaid calling

11    card.

12  **SEC. 3. REQUIRED DISCLOSURES OF PREPAID CALLING**

13        **CARDS.**

14    (a) REQUIRED DISCLOSURE.—Any prepaid calling

15  card provider or prepaid calling card distributor shall dis-

16  close clearly and conspicuously the following information

17  relating to the terms and conditions of the prepaid calling

18  card:

19        (1) The name of the prepaid calling card pro-

20    vider and such provider's customer service telephone

21    number and hours of service.

22        (2)(A) The number of domestic interstate min-

23    utes available from the prepaid calling card and the

24    number of available minutes for all international

6

1    preferred destinations served by the prepaid calling

2    card at the time of purchase; or

3        (B) the dollar value of the prepaid calling card,

4    the domestic interstate rate per minute provided by

5    such card, and the applicable per minute rates for

6    all international preferred destinations served by the

7    prepaid calling card at the time of purchase.

8        (3)(A) The applicable per minute rate for all in-

9    dividual international destinations served by the card

10    at the time of purchase; or

11        (B) a toll-free customer service number and

12    website (if the provider maintains a website) where

13    a consumer may obtain the information described in

14    subparagraph (A) and a statement that such infor-

15    mation may be obtained through such toll-free cus-

16    tomer service number and website.

17        (4) The following terms and conditions per-

18    taining to, or associated with, the use of the prepaid

19    calling card:

20        (A) Any applicable fees associated with the

21    use of the prepaid calling card.

22        (B) A description of any additional charges

23    associated with the use of the prepaid calling

24    card and the amount of such charges.

7

1              (C) Any limitation on the use or period of
2         time for which the promoted or advertised min-
3         utes or rates will be available.

4              (D) Applicable policies relating to refund,
5         recharge, and any predetermined decrease in
6         value of such card over a period of time.

7              (E) Any expiration date applicable to the
8         prepaid calling card or the minutes available
9         with such calling card.

10    (b) LOCATION OF DISCLOSURE AND LANGUAGE RE-
11 QUIREMENT.—

12         (1) CLEAR AND CONSPICUOUS.—

13              (A) CARDS.—The disclosures required
14         under subsection (a) shall be printed in plain
15         English language (except as provided in para-
16         graph (2)) in a clear and conspicuous manner
17         and location on the prepaid calling card. If the
18         card is enclosed in packaging that obscures the
19         disclosures on the card, such disclosures also
20         shall be printed on the outside packaging of the
21         card.

22              (B) ONLINE SERVICES.—In addition to the
23         requirements under subparagraph (A), in the
24         case of a prepaid calling card that consumers
25         purchase via the Internet, the disclosures re-

**HR 3402 RFS**

8

1    quired under subsection (a) shall be displayed

2    in plain English language (except as provided in

3    paragraph (2)) in a clear and conspicuous man-

4    ner and location on the Internet website that

5    the consumer must access prior to purchasing

6    such card.

7    (C) ADVERTISING AND OTHER PRO-

8    MOTIONAL MATERIAL.—Any advertising for a

9    prepaid calling card that contains any represen-

10    tation, expressly or by implication, regarding

11    the dollar value, the per minute rate, or the

12    number of minutes provided by the card shall

13    include in a clear and conspicuous manner and

14    location all the disclosures described in sub-

15    section (a).

16    (2) FOREIGN LANGUAGES.—If a language other

17    than English is prominently used on a prepaid call-

18    ing card, its packaging, or in point-of-sale adver-

19    tising, Internet advertising, or promotional material

20    for such card, the disclosures required by this sec-

21    tion shall be disclosed in that language on such card,

22    packaging, advertisement, or promotional material.

23    (c) MINUTES ANNOUNCED, PROMOTED, OR ADVER-

24    TISED THROUGH VOICE PROMPTS.—Any information pro-

25    vided to a consumer by any voice prompt given to the con-

9

1 sumer at the time the consumer uses the prepaid calling

2 card relating to the remaining value of the calling card

3 or the number of minutes available from the calling card

4 shall be accurate, taking into account the application of

5 the fees and additional charges required to be disclosed

6 under subsection (a).

7     (d) DISCLOSURES REQUIRED UPON PURCHASE OF

8 ADDITIONAL MINUTES.—If a prepaid calling card permits

9 a consumer to add value to the card or purchase additional

10 minutes after the original purchase of the prepaid calling

11 card, any changes to the rates or additional charges re-

12 quired to be disclosed under subsection (a) shall apply only

13 to the additional minutes to be purchased and shall be

14 disclosed to the consumer before the completion of such

15 purchase.

16 **SEC. 4. ENFORCEMENT BY THE FEDERAL TRADE COMMIS-**

17         **SION.**

18     (a) UNFAIR AND DECEPTIVE ACT OR PRACTICE.—

19 A violation of section 3 shall be treated as a violation of

20 a rule defining an unfair or deceptive act or practice pre-

21 scribed under section 18(a)(1)(B) of the Federal Trade

22 Commission Act (15 U.S.C. 57a(a)(1)(B)).

23     (b) AUTHORITY OF THE COMMISSION.—The Commis-

24 sion shall enforce this Act in the same manner and by

25 the same means as though all applicable terms and provi-

10

1  sions of the Federal Trade Commission Act were incor-

2  porated into and made a part of this Act. Notwithstanding

3  any provision of the Federal Trade Commission Act or any

4  other provision of law and solely for purposes of this Act,

5  common carriers subject to the Communications Act of

6  1934 (47 U.S.C. 151 et seq.) and any amendment thereto

7  shall be subject to the jurisdiction of the Commission.

8      (c) RULEMAKING AUTHORITY.—Not later than 180

9  days after the date of enactment of this Act, the Commis-

10  sion shall, in consultation with the Federal Communica-

11  tions Commission and in accordance with section 553 of

12  title 5, United States Code, issue regulations to carry out

13  this Act. In promulgating such regulations, the Commis-

14  sion shall—

15      (1) take into consideration the need for clear

16      disclosures that provide for easy comprehension and

17      comparison by consumers, taking into account the

18      size of prepaid calling cards; and

19      (2) give due consideration to the views of the

20      Federal Communications Commission with regard to

21      matters for which that Commission has particular

22      expertise and authority and shall take into consider-

23      ation the views of States.

11

1  In promulgating such regulations, the Commission shall
2  not issue regulations that otherwise affect the rates,
3  terms, and conditions of prepaid calling cards.

4      (d) SAVINGS PROVISION.—Nothing in this Act shall
5  be construed to limit the authority of the Commission
6  under any other provision of law. Except to the extent ex-
7  pressly provided in this Act, nothing in this Act shall be
8  construed to alter or affect the exemption for common car-
9  riers provided by section 5(a)(2) of the Federal Trade
10  Commission Act (15 U.S.C. 45(a)(2)). Nothing in this Act
11  is intended to limit the authority of the Federal Commu-
12  nications Commission.

13  **SEC. 5. STATE ENFORCEMENT.**

14      (a) IN GENERAL.—

15          (1) CIVIL ACTIONS.—In any case in which the
16      attorney general of a State, a State utility commis-
17      sion, or other consumer protection agency has rea-
18      son to believe that an interest of the residents of
19      that State has been or is threatened or adversely af-
20      fected by the engagement of any person in a practice
21      that is prohibited under this Act, the State utility
22      commission or other consumer protection agency, if
23      authorized by State law, or the State, as parens
24      patriae, may bring a civil action on behalf of the
25      residents of that State in a district court of the

12

1 United States of appropriate jurisdiction, or any

2 other court of competent jurisdiction to—

3   (A) enjoin that practice;

4   (B) enforce compliance with this Act;

5   (C) obtain damage, restitution, or other

6 compensation on behalf of residents of the

7 State; or

8   (D) obtain such other relief as the court

9 may consider to be appropriate.

10 (2) NOTICE TO THE COMMISSION.—

11   (A) IN GENERAL.—Before filing an action

12 under paragraph (1), the State shall provide to

13 the Commission—

14    (i) written notice of the action; and

15    (ii) a copy of the complaint for the ac-

16 tion.

17   (B) EXEMPTION.—

18    (i) IN GENERAL.—Subparagraph (A)

19 shall not apply with respect to the filing of

20 an action by a State under this subsection,

21 if the attorney general or other appropriate

22 officer determines that it is not feasible to

23 provide the notice described in that sub-

24 paragraph before the filing of the action.

**HR 3402 RFS**

13

1              (ii) NOTIFICATION.—In an action de-
2          scribed in clause (i), the State shall pro-
3          vide notice and a copy of the complaint to
4          the Commission at the same time as the
5          State files the action.
6    (b) INTERVENTION BY COMMISSION.—
7          (1) IN GENERAL.—On receiving notice under
8    subsection (a)(2), the Commission shall have the
9    right to intervene in the action that is the subject
10   of the notice.
11         (2) EFFECT OF INTERVENTION.—If the Com-
12   mission intervenes in an action under subsection (a),
13   it shall have the right—
14              (A) to be heard with respect to any matter
15          that arises in that action;
16              (B) to remove the action to the appro-
17          priate United States District Court; and
18              (C) to file a petition for appeal.
19   (c) CONSTRUCTION.—For purposes of bringing any
20   civil action under subsection (a), nothing in this section
21   shall be construed to prevent an attorney general of a
22   State, a State utility commission, or other consumer pro-
23   tection agency authorized by State law from exercising the
24   powers conferred on the attorney general or other appro-
25   priate official by the laws of that State to—

14

1    (1) conduct investigations;

2    (2) administer oaths or affirmations;

3    (3) compel the attendance of witnesses or the

4    production of documentary and other evidence; or

5    (4) enforce any State law.

6    (d) ACTION BY THE COMMISSION MAY PRECLUDE

7    STATE ACTION.—In any case in which an action is insti-

8    tuted by or on behalf of the Commission for violation of

9    this Act, or any regulation issued under this Act, no State

10   may, during the pendency of that action, institute an ac-

11   tion under subsection (a) against any defendant named

12   in the complaint in that action for violation of this Act

13   or regulation.

14   (e) VENUE; SERVICE OF PROCESS.—

15       (1) VENUE.—Any action brought under sub-

16   section (a) may be brought in the district court of

17   the United States that meets applicable require-

18   ments relating to venue under section 1391 of title

19   28, United States Code.

20       (2) SERVICE OF PROCESS.—In an action

21   brought under subsection (a), process may be served

22   in any district in which the defendant—

23           (A) is an inhabitant; or

24           (B) may be found.

15

1     (f) LIMITATION.—No prepaid calling card distributor

2  who is a retail merchant or seller of prepaid calling cards,

3  who, with respect to such cards, is exclusively engaged in

4  point-of-sale transactions may be liable for damages in an

5  action authorized under this section unless such dis-

6  tributor acted with actual knowledge that the act or prac-

7  tice giving rise to such action is unfair or deceptive and

8  is unlawful under this Act.

9  **SEC. 6. APPLICATION.**

10    This Act shall apply to—

11       (1) any prepaid calling card issued or placed

12    into the stream of commerce beginning 90 days after

13    the date on which final regulations are promulgated

14    pursuant to section 4(c); and

15       (2) any advertising, promotion, point-of-sale

16    material or voice prompt regarding a prepaid calling

17    card that is disseminated beginning 90 days after

18    the date on which final regulations are promulgated

19    pursuant to section 4(c).

20  If the Commission determines that it is not feasible for

21  prepaid calling card providers or distributors to comply

22  with the requirements of this Act with respect to prepaid

23  calling cards issued or placed into the stream of commerce

24  after such 90-day period, the Commission may extend

25  such period by not more than an additional 90 days.

**HR 3402 RFS**

16

1 **SEC. 7. EFFECT ON STATE LAWS.**

2    After the date on which final regulations are promul-

3 gated pursuant to section 4(c), no State or political sub-

4 division of a State may establish or continue in effect any

5 provision of law that prescribes disclosure requirements

6 with respect to prepaid calling cards unless such require-

7 ments are identical to the requirements of section 3.

8 **SEC. 8. G.A.O. STUDY.**

9    Beginning 2 years after the date on which final regu-

10 lations are promulgated pursuant to section 4(c), the

11 Comptroller General shall conduct a study of the effective-

12 ness of this Act and the disclosures required under this

13 Act and shall submit a report of such study to Congress

14 not later than 3 years after the date of enactment of this

15 Act.

   Passed the House of Representatives September 25,
2008.

   Attest:              LORRAINE C. MILLER,
                                          *Clerk.*

**HR 3402 RFS**

# ATTACHMENT D

II

111TH CONGRESS
1ST SESSION
# S. 562

To require accurate and reasonable disclosure of the terms and conditions
of prepaid telephone calling cards and services, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES

MARCH 10, 2009

Mr. NELSON of Florida (for himself, Ms. SNOWE, and Ms. KLOBUCHAR) intro-
duced the following bill; which was read twice and referred to the Com-
mittee on Commerce, Science, and Transportation

---

# A BILL

To require accurate and reasonable disclosure of the terms
and conditions of prepaid telephone calling cards and
services, and for other purposes.

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4      This Act may be cited as the "Prepaid Calling Card

5   Consumer Protection Act of 2009".

6   **SEC. 2. DEFINITIONS.**

7      In this Act:

8         (1) COMMISSION.—The term "Commission"

9      means the Federal Trade Commission.

2

1    (2) FEES.—

2        (A) IN GENERAL.—The term "fees" means

3    all charges, fees, taxes, or surcharges, including

4    connection, hang-up, service, payphone, and

5    maintenance charges, which may be—

6            (i) required by State or Federal stat-

7        ute or by regulation or order of the Com-

8        mission or a State; or

9            (ii) permitted to be assessed by a

10        State or Federal statute or by regulation

11        or order of the Commission or a State.

12        (B) EXCLUSION.—The term "fees" does

13    not include the applicable per unit or per-

14    minute rate for the particular destination called

15    by a consumer.

16    (3) INTERNATIONAL PREFERRED DESTINA-

17    TION.—The term "international preferred destina-

18    tion" means a specific international destination

19    named on a prepaid telephone calling card or on the

20    packaging material accompanying a prepaid tele-

21    phone calling card.

22    (4) PREPAID TELEPHONE CALLING CARD.—

23        (A) IN GENERAL.—The terms "prepaid

24    telephone calling card" and "card" mean—

•S 562 IS

3

1    (i) a card or similar device that allows

2    users to pay in advance for a specified

3    amount of calling, without regard to addi-

4    tional features, functions, or capabilities

5    available in conjunction with a prepaid

6    telephone calling service; or

7    (ii) any right of use purchased in ad-

8    vance for a sum certain linked to an access

9    number and authorization code that—

10   (I) enables a consumer to use a

11   prepaid telephone calling service; and

12   (II) is embodied on a card or

13   other physical object, or purchased by

14   an electronic or telephonic means

15   through which the purchaser obtains

16   access numbers and authorization

17   codes that are not physically located

18   on a card, its packaging, an Internet

19   website, or other promotional mate-

20   rials.

21   (B)   EXCLUSION.—The terms "prepaid

22   telephone calling card" and "card" do not in-

23   clude cards or other rights of use that provide

24   access to—

•S 562 IS

4

1         (i) service provided for free, or at no

2         additional charge as a promotional item

3         accompanying a product or service pur-

4         chased by a consumer; or

5         (ii) a wireless telecommunications

6         service account with a wireless service pro-

7         vider that the purchaser has a preexisting

8         relationship with or establishes a carrier

9         customer relationship with via the pur-

10         chase of a prepaid wireless telecommuni-

11         cations service handset package.

12     (5) PREPAID TELEPHONE CALLING CARD DIS-

13 TRIBUTOR.—

14         (A) IN GENERAL.—The term "prepaid

15         telephone calling card distributor" means any

16         person that—

17         (i) purchases prepaid telephone calling

18         cards or services from a prepaid telephone

19         calling service provider; and

20         (ii) sells, resells, issues, or distributes

21         prepaid telephone calling cards to 1 or

22         more distributors of such cards or to 1 or

23         more retail sellers of such cards.

24         (B) EXCLUSION.—The term "prepaid tele-

25         phone calling card distributor" does not include

5

1   any retail merchant or seller of prepaid tele-
2   phone calling cards exclusively engaged in
3   point-of-sale transactions with end-user cus-
4   tomers.
5   (6) PREPAID TELEPHONE CALLING SERVICE.—
6       (A) IN GENERAL.—The terms "prepaid
7   telephone calling service" and "service" mean
8   any real time voice communications service, re-
9   gardless of the technology or network utilized,
10  paid for in advance by a consumer, that allows
11  a consumer to originate voice telephone calls
12  through a local, long distance, or toll-free access
13  number and authorization code, whether manu-
14  ally or electronically dialed.
15      (B) EXCLUSION.—The terms "prepaid
16  telephone calling service" and "service" do not
17  include any service that provides access to a
18  wireless telecommunications service account if
19  the purchaser has a preexisting relationship
20  with the wireless service provider or establishes
21  a carrier-customer relationship via the purchase
22  of a prepaid wireless telecommunications service
23  handset package.
24  (7) PREPAID TELEPHONE CALLING SERVICE
25  PROVIDER.—The term "prepaid telephone calling

6

1    service provider" means any person providing pre-

2    paid telephone calling service to the public using its

3    own, or a resold, network offering real time voice

4    communications service regardless of the technology

5    utilized.

6    (8) WIRELESS TELECOMMUNICATIONS SERV-

7    ICE.—The term "wireless telecommunications serv-

8    ice" has the meaning given the term "commercial

9    mobile service" in section 332(d) of the Communica-

10    tions Act of 1934 (47 U.S.C. 332(d)).

11    **SEC. 3. REQUIRED DISCLOSURES OF PREPAID TELEPHONE**

12    **CALLING CARDS OR SERVICES.**

13    (a) REQUIRED DISCLOSURE; RULEMAKING.—Not

14    later than 180 days after the date of enactment of this

15    Act, the Commission shall prescribe regulations that re-

16    quire every prepaid telephone calling service provider or

17    prepaid telephone calling card distributor to disclose the

18    following information relating to the material terms and

19    conditions of the prepaid telephone calling card or service:

20    (1) INFORMATION RELATING TO DOMESTIC

21    INTERSTATE CALLS.—

22    (A) The number of calling units or minutes

23    of domestic interstate calls provided by such

24    card or service at the time of purchase; or

7

1       (B) the dollar value of such card or service

2       and the domestic interstate rate per-minute

3       provided by such card or service at the time of

4       purchase.

5       (2) INFORMATION RELATING TO INTER-

6   NATIONAL PREFERRED DESTINATIONS.—The appli-

7   cable calling unit or per-minute rates for each inter-

8   national preferred destinations served by such card

9   or service.

10      (3) INFORMATION RELATING TO INDIVIDUAL

11  INTERNATIONAL DESTINATIONS.—

12          (A) The applicable calling unit or per-

13          minute rates for each individual international

14          destinations served by such card or service.

15          (B) That the applicable calling unit or per-

16          minute rates for each individual international

17          destination may be obtained through the pre-

18          paid telephone calling card provider's toll-free

19          customer service number and Internet website.

20          (C) Whether those rates fluctuate.

21      (4) OTHER MATERIAL TERMS AND CONDI-

22  TIONS.—Other material terms and conditions per-

23  taining to the use of such card or service, includ-

24  ing—

25          (A) the amount and frequency of all fees;

8

1          (B) a description of applicable policies re-

2      lating to refund, recharge, decrement, or expi-

3      ration; and

4          (C) limitations, if any, on the use or period

5      of time for which the displayed, promoted, or

6      advertised minutes or rates will be available to

7      the customer.

8      (5) SERVICE PROVIDER INFORMATION.—Infor-

9  mation relating to the service provider, including—

10          (A) the name of the service provider;

11          (B) the address of such service provider,

12      which shall be made available on the provider's

13      website (if any), together with the uniform re-

14      source locator address thereof; and

15          (C) a toll-free telephone number that may

16      be used to contact the customer service depart-

17      ment of such service provider, together with the

18      hours of service of the customer service depart-

19      ment.

20  (b) CLEAR AND CONSPICUOUS DISCLOSURE OF RE-

21  QUIRED INFORMATION AND LANGUAGE REQUIRE-

22  MENTS.—In prescribing regulations under subsection (a),

23  the Commission shall require, at a minimum, that—

24          (1) the required disclosures (other than the dis-

25      closure required by subsection (a)(3)(A)) for prepaid

9

1    telephone calling cards are printed in plain English

2    in a clear and conspicuous location on the card, or

3    on the packaging of the card, so as to be plainly visi-

4    ble to a consumer at the point of sale;

5       (2) the required disclosures (other than the dis-

6    closure required by subsection (a)(3)(B)) for prepaid

7    telephone calling service that consumers access and

8    purchase via the Internet are displayed in plain

9    English in a clear and conspicuous location on the

10   Internet site from which the consumer purchases

11   such service, and include conspicuous instructions

12   and directions to any link to such disclosures;

13      (3) the required disclosures (other than the dis-

14   closure required by subsection (a)(3)(A)) for adver-

15   tising and other promotional materials are printed

16   on any advertising for the prepaid telephone calling

17   card or service used at the point of sale, including

18   on any signs for display by retail merchants, dis-

19   played on any Internet site used to promote mate-

20   rial, and on any other promotional material used at

21   the point of sale that is prepared by, or at the direc-

22   tion of, any person that is subject to the require-

23   ments of this Act;

24      (4) if a language other than English is pre-

25   dominantly used on a prepaid telephone calling card

10

1   or its packaging, or in the point-of-sale advertising,

2   Internet advertising, or promotional material of a

3   prepaid telephone calling card or prepaid telephone

4   calling service, then the required disclosures are pro-

5   vided in that language on such card, packaging, ad-

6   vertisement, or promotional material in the same

7   manner as if they were provided in English; and

8       (5) if a language other than English is pre-

9   dominantly used on a prepaid telephone calling card

10  or its packaging, or in the point-of-sale advertising,

11  or promotional materials of a prepaid telephone call-

12  ing card or prepaid telephone calling service, then

13  the customer service department reached via a toll-

14  free number must provide basic customer support

15  (per-minute rate or equivalent calling units for each

16  destination, fees, and terms of service) in that lan-

17  guage.

18  (e) IMPLEMENTING REGULATIONS.—The Commis-

19  sion may, in accordance with section 553 of title 5, United

20  States Code, prescribe such other disclosure regulations

21  as the Commission determines are necessary to implement

22  this section.

11

1   **SEC. 4. UNLAWFUL CONDUCT RELATED TO PREPAID TELE-**

2         **PHONE CALLING CARDS.**

3     (a) PREPAID TELEPHONE CALLING SERVICE PRO-

4  VIDER.—It shall be unlawful for any prepaid telephone

5 calling service provider to do any of the following:

6        (1) UNDISCLOSED FEES AND CHARGES.—To

7      assess or deduct from the balance of a prepaid tele-

8      phone calling card any fee or other amount for use

9      of the prepaid telephone calling service, except—

10           (A) the per-minute rate or value for each

11          particular destination called by the consumer;

12          and

13           (B) fees that are disclosed in accordance

14          with the regulations prescribed under section 3.

15        (2) MINUTES AND RATES AS PROMOTED AND

16      ADVERTISED.—With respect to a prepaid telephone

17      calling card for a service of the prepaid telephone

18      calling service provider, to provide fewer minutes

19      than the number of minutes promoted or advertised,

20      or to charge a higher per-minute rate to a specific

21      domestic destination or international preferred des-

22      tination than the per-minute rate to that specific

23      destination promoted or advertised, on—

24           (A) the prepaid telephone calling card;

25           (B) any point-of-sale material relating to

26          the card that is prepared by or at the direction

12

1         of the prepaid telephone calling card service

2         provider; or

3             (C) other advertising related to the card or

4         service.

5         (3) MINUTES ANNOUNCED, PROMOTED, AND

6         ADVERTISED THROUGH VOICE PROMPTS.—To pro-

7         vide fewer minutes than the number of minutes an-

8         nounced, promoted, or advertised through any voice

9         prompt given by the prepaid telephone calling service

10       provider to a consumer at the time the consumer

11       places a call to a dialed domestic destination or

12       international preferred destination with a prepaid

13       telephone calling card or service.

14       (4) EXPIRATION.—To provide, sell, resell, issue,

15       or distribute a prepaid telephone calling card that

16       expires—

17            (A) before the date that is 1 year after the

18       date on which such card is first used; or

19            (B) in the case of a prepaid telephone call-

20       ing card or service that permits a consumer to

21       purchase additional usage minutes or add addi-

22       tional value to the card, before the date that is

23       1 year after the date on which the consumer

24       last purchased additional usage minutes or

25       added additional value to the card.

13

1   (5) CHARGES FOR UNCONNECTED CALLS.—To

2 assess any fee or charge for any unconnected tele-

3 phone call. For purposes of this paragraph, a tele-

4 phone call shall not be considered connected if the

5 person placing the call receives a busy signal or if

6 the call is unanswered.

7   (6) MAXIMUM BILLING INCREMENTS.—To as-

8 sess or deduct a per-minute rate (or equivalent call-

9 ing unit) in an increment greater than 1 minute of

10 calling time for calls that are less than 1 full

11 minute. It shall not be a violation of this section for

12 a prepaid telephone calling service provider to de-

13 duct different destination-specific rates (or equiva-

14 lent calling units) for each full minute of calling

15 time in accordance with properly disclosed rates or

16 other terms and conditions.

17 (b) PREPAID TELEPHONE CALLING CARD DIS-

18 TRIBUTOR.—It shall be unlawful for any prepaid telephone

19 calling card distributor to do any of the following:

20   (1) UNDISCLOSED FEES AND CHARGES.—To

21 assess or deduct from the balance of a prepaid tele-

22 phone calling card any fee or other amount for use

23 of the prepaid telephone calling service, except—

14

1         (A) the per-minute rate or value for each

2         particular destination called by the consumer;

3         and

4         (B) fees that are disclosed as required by

5         regulations prescribed under section 3.

6     (2) MINUTES AS PROMOTED AND ADVER-

7 TISED.—To sell, resell, issue, or distribute any pre-

8 paid telephone calling card that the distributor

9 knows provides fewer minutes than the number of

10 minutes promoted or advertised, or a higher per-

11 minute rate to a specific destination than the per-

12 minute rate to that specific destination promoted or

13 advertised, on—

14         (A) the prepaid telephone calling card that

15         is prepared by or at the direction of the prepaid

16         telephone calling card service distributor;

17         (B) any point of sale material relating to

18         the card that is prepared by or at the direction

19         of the prepaid telephone calling card service dis-

20         tributor; or

21         (C) other advertising relating to the card

22         or service.

23     (3) MINUTES ANNOUNCED, PROMOTED, OR AD-

24 VERTISED THROUGH VOICE PROMPTS.—To sell, re-

25 sell, issue, or distribute a prepaid telephone calling

15

1    card that such distributor knows provides fewer min-

2    utes than the number of minutes announced, pro-

3    moted, or advertised through any voice prompt given

4    to a consumer at the time the consumer places a call

5    to a dialed destination with the prepaid telephone

6    calling card or service.

7        (4) EXPIRATION.—To provide, sell, resell, issue,

8    or distribute a prepaid telephone calling card that

9    expires—

10        (A) before the date that is 1 year after the

11        date on which such card is first used; or

12        (B) in the case of a prepaid telephone call-

13        ing card that permits a consumer to purchase

14        additional usage minutes or add additional

15        value to the card or service, before the date

16        that is 1 year after the date on which the con-

17        sumer last purchased additional usage minutes

18        or added additional value to the card or service.

19    (e) LIABILITY.—A prepaid telephone calling service

20    provider or a prepaid telephone calling card distributor

21    may not avoid liability under this section by stating that

22    the displayed, announced, promoted, or advertised min-

23    utes, or the per-minute rate to a specific destination, are

24    subject to fees or charges. A prepaid calling service pro-

25    vider or prepaid calling distributor shall not be liable for

16

1 the disclosure of lawful fees, charges, or limitations made

2 pursuant to regulations prescribed by the Commission

3 under section 3, including lawful conditions of use.

4     (d) IMPLEMENTING REGULATIONS.—The Commis-

5 sion may, in accordance with section 553 of title 5, United

6 States Code, prescribe such regulations as the Commission

7 determines are necessary to implement this section.

**8 SEC. 5. ENFORCEMENT BY THE FEDERAL TRADE COMMIS-**

**9          SION.**

10     (a) UNFAIR AND DECEPTIVE ACT OR PRACTICE.—

11 Notwithstanding any other provision of law, a violation of

12 a regulation prescribed under section 3 or the commission

13 of an unlawful act proscribed under section 4 shall be

14 treated as a violation of a rule defining an unfair or decep-

15 tive act or practice prescribed under section 18(a)(1)(B)

16 of the Federal Trade Commission Act (15 U.S.C.

17 57a(a)(1)(B)).

18     (b) AUTHORITY OF THE COMMISSION.—The Commis-

19 sion shall enforce this Act in the same manner and by

20 the same means as though all applicable terms and provi-

21 sions of the Federal Trade Commission Act were incor-

22 porated into and made a part of this Act. Notwithstanding

23 section 5(a)(2) of the Federal Trade Commission Act (15

24 U.S.C. 45(a)(2)), communications common carriers shall

25 be subject to the jurisdiction of the Commission exclusively

17

1 for the purposes of this Act, and section 5(a)(2) shall not
2 be otherwise affected.

3     (c) FEDERAL COMMUNICATIONS COMMISSION AU-
4 THORITY.—

5          (1) To the extent that the Federal Trade Com-
6     mission has authority under this Act with respect to
7     prepaid calling cards, prepaid calling card providers
8     and prepaid calling card distributors, the Federal
9     Communications Commission shall not exercise any
10     authority that it may otherwise have with respect to
11     such cards, providers and distributors.

12          (2) Except as provided in paragraph (1), noth-
13     ing in this Act affects the authority of the Federal
14     Communications Commission with respect to such
15     prepaid calling card providers and distributors.

16 **SEC. 6. STATE ENFORCEMENT.**

17     (a) IN GENERAL.—

18          (1) CIVIL ACTIONS.—In any case in which the
19     attorney general of a State, a State utility commis-
20     sion, or other authorized State consumer protection
21     agency has reason to believe that an interest of the
22     residents of that State has been or is threatened or
23     adversely affected by the engagement of any person
24     in a practice that is prohibited under this Act, the
25     State, as parens patriae, may bring a civil action on

18

1  behalf of the residents of that State in a district
2  court of the United States of appropriate jurisdic-
3  tion—

4      (A) to enjoin that practice;
5      (B) to enforce compliance with this Act;
6      (C) to obtain damage, restitution, or other
7  compensation on behalf of residents of the
8  State; or
9      (D) to obtain such other relief as the court
10  may consider to be appropriate.

11  (2) NOTICE TO FEDERAL TRADE COMMIS-
12  SION.—

13      (A) IN GENERAL.—Before filing an action
14  under paragraph (1), the attorney general of a
15  State, a State utility commission, or an author-
16  ized State consumer protection agency shall
17  provide to the Commission—

18          (i) written notice of the action; and
19          (ii) a copy of the complaint for the ac-
20  tion.

21      (B) EXEMPTION.—

22          (i) IN GENERAL.—Subparagraph (A)
23  shall not apply to the filing of an action
24  under paragraph (1) if the attorney gen-
25  eral of a State, a State utility commission,

•S 562 IS

19

1      or an authorized State consumer protection

2      agency filing such action determines that it

3      is not feasible to provide the notice de-

4      scribed in subparagraph (A) before the fil-

5      ing of the action.

6          (ii) NOTIFICATION.—In an action de-

7      scribed in clause (i), the attorney general

8      of a State, a State utility commission, or

9      an authorized State consumer protection

10     agency shall provide notice and a copy of

11     the complaint to the Commission at the

12     time the action is filed.

13    (b) INTERVENTION BY FEDERAL TRADE COMMIS-

14 SION.—

15     (1) IN GENERAL.—Upon receiving notice under

16 subsection (a)(2), the Commission may intervene in

17 the action that is the subject of such notice.

18     (2) EFFECT OF INTERVENTION.—If the Com-

19 mission intervenes in an action under subsection (a),

20 the Commission may—

21      (A) be heard with respect to any matter

22     that arises in that action; and

23      (B) file a petition for appeal.

24    (c) CONSTRUCTION.—Nothing in this Act may be

25 construed to prevent an attorney general of a State, a

20

1   State utility commission, or an authorized State consumer

2   protection agency from exercising the powers conferred on

3   the attorney general, a State utility commission, or an au-

4   thorized State consumer protection agency by the laws of

5   that State—

6          (1) to conduct investigations;

7          (2) to administer oaths or affirmations;

8          (3) to compel the attendance of witnesses or the

9    production of documentary and other evidence;

10         (4) to enforce any State consumer protection

11    laws of general applicability; or

12         (5) to establish or utilize existing administrative

13    procedures to enforce the provisions of the law of

14    such State.

15   (d) VENUE; SERVICE OF PROCESS.—

16         (1) VENUE.—Any action brought under sub-

17    section (a) shall be brought in the district court of

18    the United States that meets applicable require-

19    ments relating to venue under section 1391 of title

20    28, United States Code.

21         (2) SERVICE OF PROCESS.—In an action

22    brought under subsection (a), process may be served

23    in any district in which the defendant—

24         (A) is an inhabitant; or

25         (B) may be found.

21

**SEC. 7. APPLICATION.**

The regulations prescribed under section 3 and the provisions of sections 3 and 4 shall apply to any prepaid telephone calling card issued or placed into the stream of commerce, and to any advertisement, promotion, point-of-sale material or voice prompt regarding a prepaid telephone calling service that is created or disseminated more than 120 days after the date on which the regulations prescribed under section 3 are published in the Federal Register.

**SEC. 8. EFFECT ON STATE LAW.**

(a) PREEMPTION.—

(1) IN GENERAL.—Except as otherwise provided in this section, this Act preempts the laws of any State or political subdivision thereof to the extent that such laws are inconsistent with this Act, or the rules, regulations, or orders issued by the Commission under this Act.

(2) EXCEPTIONS.—This Act shall not preempt any provision of State law or enforcement action that provides additional enforcement protection to consumers of prepaid telephone calling cards if such provision of law or enforcement action—

(A) imposes higher fines or more punitive civil or criminal remedies, including injunctive relief, for any violation of this Act, or the rules,

22

1    regulations, or orders issued by the Commission

2    under this Act; or

3        (B)(i) relates to terms, conditions, or

4    issues that are not addressed by this Act, or by

5    the rules, regulations, or orders issued by the

6    Commission under this Act; and

7        (ii) is not determined by the Commission

8    to be inconsistent with the public interest.

9    (b) PETITIONS CONCERNING PREEMPTION.—

10        (1) PETITIONS BY PROVIDERS.—

11          (A) AUTHORITY TO PETITION.—A prepaid

12    telephone calling card provider or a prepaid

13    telephone calling card distributor may submit a

14    petition to the Commission to challenge a State

15    law or regulation—

16            (i) as inconsistent with this Act or the

17    rules, regulations, or orders issued by the

18    Commission under this Act; or

19            (ii) as inconsistent with the public in-

20    terest, if the measure relates to terms, con-

21    ditions, or issues that are not addressed by

22    this Act, or the rules, regulations, or or-

23    ders issued by the Commission under this

24    Act.

23

1          (B)  DEADLINE  FOR  COMMISSION  AC-

2     TION.—Within 90 days after receiving a peti-

3     tion under subparagraph (A), the Commission

4     shall issue a final determination on the issues

5     presented in the petition. The Commission may

6     issue an order staying the effectiveness of any

7     State law or regulation that is the subject of

8     the petition during, but for no longer than,

9     such 90-day period.

10          (2) PROCEEDINGS ON UNADDRESSED ISSUES.—

11     If, on the basis of any petition under paragraph (1),

12     the Commission determines that a term, condition,

13     or issue is not addressed by sections 3 or 4 of this

14     Act, or the rules issued by the Commission under

15     this section 3 of this Act, the Commission shall,

16     within 180 days after the date of such determina-

17     tion, conduct an inquiry or other proceeding to de-

18     termine whether the Commission should, in the pub-

19     lic interest, promulgate a rule, pursuant to section

20     3(e), to address such term, condition, or issue.

21  **SEC. 9. GAO STUDY.**

22     Beginning 1 year after the date on which final regula-

23  tions are promulgated pursuant to section 3(a), the Comp-

24  troller General shall conduct a study of the effectiveness

25  of this Act and the disclosures required under this Act

24

1   and shall submit a report of such study to the House Com-

2   mittee on Energy and Commerce and the Senate Com-

3   mittee on Commerce, Science, and Transportation no later

4   than 2 years after the date of enactment of this Act.

○